[No. G019194. Fourth Dist., Div. Three. Mar. 30, 1999.]

SHAUNIE EMINGER SCHMOLL, Plaintiff and Appellant, v. CHAPMAN UNIVERSITY, Defendant and Respondent.

**COUNSEL**

Grace E. Emery for Plaintiff and Appellant.

Rutan & Tucker, Ernest W. Klatte III, Sandra J. Young and April L. Walter for Defendant and Respondent.

## OPINION

**SONENSHINE, J.**—In this case of first impression, we hold the establishment and free exercise clauses of the First Amendment of the United States Constitution[1] bar judicial review in a lawsuit alleging a church-affiliated university modified the terms of employment of its campus chaplain, in violation of the Fair Employment and Housing Act, Government Code section 12900 et seq. (FEHA). It matters not whether such an employment decision is based on doctrine or economics. It is irrelevant whether the action involves hiring, firing or discipline or simply changes the terms and conditions of the employment. The rule is about as absolute as a rule of law can be: The First Amendment guarantees to a religious institution the right to decide matters affecting its ministers' employment, free from the scrutiny and second-guessing of the civil courts. This case is no exception.

I

Chapman University (Chapman) is affiliated with the Christian Church, Disciples of Christ. The Reverend Shaunie Eminger Schmoll is an ordained minister of that church. In June 1991, Chapman hired Schmoll as its full-time chaplain and director of campus ministry. In February 1994, the school informed Schmoll budget constraints required a 50 percent reduction of her hours, with a concomitant reduction of benefits.

Schmoll sued Chapman for damages, alleging the university's action was not financially motivated, but rather was discriminatory and retaliatory. She claimed she was being punished for telling school administrators about some student complaints of sexual harassment by two faculty members.[2]

---

[1] All further First Amendment references are to the United States Constitution.

[2] Specifically, Schmoll alleged Chapman students "whom she counseled as a chaplain [told her] two male faculty members had sexually harassed them . . . . by attempted sexual seduction, unwanted and offensive touching of intimate parts of a male student's body, and threats of interference with plans for graduate school to students who complained." On information and belief, she further alleged Chapman had known about the problem "for many years," but had failed to take any disciplinary action. When Schmoll reported the complaints, she was told nothing could be done if the students themselves would not "personally confront the faculty members against whom they had complaints." Schmoll then "began to experience some [unspecified] negative reactions toward her employment, in retaliation for her advocacy for the students, culminating in the termination of her full-time employment status."

The complaint was framed in three causes of action—breach of implied employment contract to terminate only for good cause (constructive discharge), sex discrimination in violation of FEHA, and violation of public policy. Schmoll did not seek to have her full-time schedule reinstated.

In its response, Chapman did not assert—and has never contended—it is wholly exempt from FEHA under the statutory exemption for certain religious entities. (Gov. Code, § 12940, subd. (h)(3)(B); see *McKeon* v. *Mercy Healthcare Sacramento* (1998) 19 Cal.4th 321 [79 Cal.Rptr.2d 319, 965 P.2d 1189].) Rather, in its motion for summary judgment, it contended the religion clauses of the First Amendment bar civil court review of an employment dispute between a religious organization and its ministerial employee.

In its separate statement, it presented undisputed facts demonstrating its church affiliation. In particular, it submitted its most recent formal covenant with the Christian Church, Disciples of Christ in 1993, in which Chapman pledged, inter alia, to (1) "reflect a Judeo-Christian tradition in its leadership and in its life"; (2) "provide . . . on-campus curricular opportunities for spiritual understanding, worship, and sharing, including Biblical studies"; (3) "use the services of the Church . . . as a resource for locating prospective students, administrators, faculty, trustees and staff"; (4) "provide on-campus voluntary worship services and other opportunities for the moral and ethical development of persons within its collegiate community"; (5) "cultivate a service relationship by offering the resources of its personnel, programs and facilities to congregations, regions, and general administrative units of the Church"; (6) "seek to understand and share in the life of the [C]hurch at the local, regional and general level"; (7) "include in its structure a means of preserving its Christian Church (Disciples of Christ) heritage and . . . pursue the vital relationships, goals and purposes common to Chapman and the Church"; and (8) "state in its catalog and all appropriate documents and literature its relationship with the Christian Church (Disciples of Christ)."

Chapman also established facts regarding Schmoll's employment as a member of the clergy. Inter alia, it showed Schmoll was hired as a minister of the gospel of Jesus Christ, to serve the total campus community as a pastor, and perform the duties of leading worship, directing a team of student ministers, and assisting in the recruitment of students "in the area of ministry as [a] vocation." The identified goals of Schmoll's chaplaincy included: "(a) raising the level of awareness of the spiritual dimension of life . . . ; (b) interpreting God at work in current affairs; (c) bringing awareness of eternal to the temporal; (d) influencing the design of the new chapel through programs of ministry; (e) bringing together religious and secular leaders to develop an understanding of their ability to use their resources to build a

better world; and (f) lifting up the Disciples [of Christ] church-relatedness of the college."

In light of this uncontroverted evidence, the court granted summary judgment to Chapman, finding the university constitutionally protected against state interference with its employment decision affecting Schmoll. As we will discuss, the court correctly put an end to the case.

## II

The religion clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[3] In light of that broad prohibition, the courts have developed a general rule barring judicial review of employment disputes between religious organizations and their clergy employees. A brief review of precedent informs our analysis.

The "ministerial exception" was first stated in *McClure v. Salvation Army* (5th Cir. 1972) 460 F.2d 553. There, the Salvation Army (a church) terminated McClure's commission as an officer (a minister.) McClure filed a civil rights action, alleging violations of title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e). She claimed she had received a lower salary and fewer benefits than male officers and had suffered retaliatory discharge for her complaints about gender discrimination.

The *McClure* court found application of title VII provisions to the relationship between a church and its minister violated the religion clauses of the First Amendment. Noting the existence of a "[high and impregnable] 'wall of separation' between church and State" (*McClure v. Salvation Army, supra,* 460 F.2d at p. 558), it explained, "The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. . . . Just as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection. It is unavoidably true that these include the determination of a minister's salary, his [or her] place of assignment, and the duty he [or she] is to perform in the furtherance of the religious mission of the church." (*Id.* at pp. 558-559.)

The *McClure* court then catalogued cases containing "[a] common thread" declaring " 'a spirit of freedom for religious organizations, an independence

---

[3]As stated in *Duffy v. State Personnel Bd.* (1991) 232 Cal.App.3d 1, 9 [283 Cal.Rptr. 622], "These constitutional concepts of religious autonomy which assure both free exercise and nonestablishment apply to state as well as federal action through the incorporation of their principles into the Fourteenth Amendment due process clause."

from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.' " (*McClure* v. *Salvation Army, supra,* 460 F. 2d at p. 560.) And it concluded Congress never intended federal civil rights legislation "to regulate the employment relationship between church and minister." (*Id.* at pp. 560-561.)

The ministerial exception extends to church-related institutions which have a " 'substantial religious character.' " (*Scharon* v. *St. Luke's Episcopal Presbyterian Hosp.* (8th Cir. 1991) 929 F.2d 360, 362.) Its applicability does not depend on the title given to the employee; rather, the determinative factor is the function of the person's position. (See, e.g., *Young* v. *N. Ill. Conf. of United Methodist Church* (7th Cir. 1994) 21 F.3d 184, 186.) " 'As a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in a religious ritual and worship, he or she should be considered "clergy." ' " (*Rayburn* v. *General Conf. of Seventh-Day Adventists* (4th Cir. 1985) 772 F.2d 1164, 1169.)[4]

Numerous courts have adopted and expanded *McClure*'s ministerial exception. (*E.E.O.C.* v. *Catholic University of America* (D.C. Cir. 1996) 83 F.3d 455 [317 App.D.C. 343] [ministerial exception exempted Catholic university's decision to withhold tenured membership in department of canon law]; *Young* v. *N. Ill. Conf. of United Methodist Church, supra,* 21 F.3d 184 [First Amendment precluded review of church's termination of probationary minister's status and refusal to appoint her as an elder]; *Lewis* v. *Seventh Day Adventists Lake Region Conf.* (6th Cir. 1992) 978 F.2d 940 [no judicial review available in employment termination suit brought by minister and his wife against religious organization alleging various contract and tort theories of recovery]; *Scharon* v. *St. Luke's Episcopal Presbyterian Hosp.,*

---

[4]Of course, the First Amendment is not implicated when a religious institution makes an employment decision about an employee whose "duties [do not] go to the heart of the church's function in the manner of a minister or a seminary teacher." (*E.E.O.C.* v. *Pacific Press Pub. Ass'n* (9th Cir. 1982) 676 F.2d 1272, 1278 [employment dispute between church publishing house and an editorial secretary]; see also *Vigars* v. *Valley Christian Center of Dublin, Cal.* (N.D.Cal. 1992) 805 F.Supp. 802 [parochial school's dismissal of unmarried pregnant librarian]; and *E.E.O.C.* v. *Mississippi College* (5th Cir. 1980) 626 F.2d 477, 485 ["The College's faculty and staff do not function as ministers. The faculty members are not intermediaries between a church and its congregation. They neither attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine. That faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern."].) These and like cases are of no help to Schmoll. On the contrary, because she was employed as a chaplain and campus minister, they simply underscore the futility of her arguments.

*supra,* 929 F.2d 360 [summary judgment proper for church-affiliated hospital in age and sex discrimination suit by discharged chaplain]; *Minker* v. *Baltimore Annual Conf.* (D.C. Cir. 1990) 894 F.2d 1354 [282 App.D.C. 314] [age discrimination suit by minister against his church would violate free exercise clause]; *Natal* v. *Christian and Missionary Alliance* (1st Cir. 1989) 878 F.2d 1575, 1577 ["Howsoever a suit may be labelled, once a court is called upon to probe into a religious body's selection and retention of clergymen, the First Amendment is implicated."]; *Hutchison* v. *Thomas* (6th Cir. 1986) 789 F.2d 392 [courts may not constitutionally intervene in dispute involving a religious organization's decision on the status of its minister]; *Rayburn* v. *General Conf. of Seventh-Day Adventists, supra,* 772 F.2d 1164 [suit for appointment as pastor barred by religion clauses]; *Sanders* v. *Casa View Baptist Church* (N.D.Tex. 1995) 898 F.Supp. 1169 [minister sued for sexual misconduct in role as marital counselor could not maintain cross-claims against church for breach of contract and wrongful discharge]; and *Powell* v. *Stafford* (D. Colo. 1994) 859 F.Supp. 1343 [to apply ADEA (Age Discrimination in Employment Act, 29 U.S.C. § 630 et seq.) in context of archdiocesan high school theology teacher would violate religion clauses].)

The list, far from exhaustive, illustrates a hard-and-fast rule of law which applies regardless of the employer's motivation: "In 'quintessentially religious' matters, [citation], the . . . First Amendment protects the *act of a decision* rather than a motivation behind it. In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content." (*Rayburn* v. *General Conf. of Seventh-Day Adventists, supra,* 772 F.2d at p. 1169.)

■ We now explain why Schmoll's attempt to resolve her grievances in the court runs afoul of the establishment and free exercise clauses of the First Amendment.

### The Establishment Clause

Government Code section 12940, subdivision (a), prohibits an employer from making a discriminatory gender-based employment decision absent a statutorily-specified justification. Under subdivision (f), the employer may not retaliate against a person who "has opposed any practices forbidden under [FEHA]." Schmoll contends Chapman's decision to cut her chaplain hours in half violated both of these provisions.

The issue is whether FEHA's mandates can constitutionally be applied to the Schmoll/Chapman employment dispute. (See *NLRB* v. *Catholic Bishop of Chicago* (1979) 440 U.S. 490, 499 [99 S.Ct. 1313, 1318, 59 L.Ed.2d 533].)

To answer the question, we must decide whether application of the statute would foster " 'an excessive government entanglement with religion,' " in violation of the establishment clause. (*Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 613 [91 S.Ct. 2105, 2111, 29 L.Ed.2d 745].)[5]

*Scharon* v. *St. Luke's Episcopal Presbyterian Hosp., supra,* 929 F.2d 360, is particularly apt.[6] There, a church-affiliated hospital employed an ordained priest, Anne Scharon, as a chaplain. Although some of her duties were nonreligious, others included " '[p]rovid[ing] a religious ministry of pastoral care, pastoral counseling . . . and liturgical services for persons in the hospital.' " (*Id.* at p. 361.) When Scharon was fired, she sued under title VII and the ADEA, alleging that her employer's proffered reasons for its decision were pretextual and its real motivation was illegal discrimination.

The court of appeals affirmed the district court's summary judgment for the hospital, finding application of the antidiscrimination legislation would violate both religion clauses of the First Amendment. With regard to the establishment clause, it noted adjudication of Scharon's claims would result in the state's excessive entanglement with religious matters: It observed, " '[t]he resolution of such charges . . . will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators. . . . It is not only the conclusions that may be reached . . . which may impinge on rights guaranteed by the Religion Clauses, but also *the very process of inquiry.'* " (*Scharon* v. *St. Luke's Episcopal Presbyterian Hosp., supra,* 929 F.2d at p. 363, citing *NLRB* v. *Catholic Bishop of Chicago, supra,* 440 U.S. at p. 502 [99 S.Ct. at pp. 1319-1320], italics added.)

We find equally instructive *Rayburn* v. *General Conf. of Seventh-Day Adventists, supra,* 772 F.2d at page 1171, where the court concluded "entanglement might . . . result from a protracted legal process pitting church

---

[5]As one California court has observed, there is no rigid, ironclad constitutionality test, but *Lemon* provides a guideline which can be "a useful analytical approach to resolving many establishment clause challenges to government action." (*Duffy* v. *State Personnel Bd., supra,* 232 Cal.App.3d at p. 10.) We need not dwell on the first two *Lemon* factors: It is clear FEHA (1) has "a secular legislative purpose"; and (2) "its principal or primary effect . . . neither advances nor inhibits religion." (*Lemon* v. *Kurtzman, supra,* 403 U.S. at p. 612 [91 S.Ct. at p. 2111].) Our focus here is entirely on the third factor—the issue of " 'an excessive government entanglement with religion.' [Citation.]" (*Id.* at p. 613 [91 S.Ct. at p. 2111].)

[6]Because California courts find the " 'antidiscriminatory objectives and the overriding public policy purposes' " of FEHA and federal civil rights legislation to be identical, we look to federal decisions for guidance. (*Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 606 [262 Cal.Rptr. 842].)

and state as adversaries."[7] It explained, "Bureaucratic suggestion in employment decisions of a pastoral character, in contravention of a church's own perception of its needs and purposes, would constitute unprecedented entanglement with religious authority and compromise the premise 'that both religion and government can best work to achieve their lofty aims if each is left free of the other within its respective sphere.' [Citation.]" (*Ibid.*) And it warned of "danger that churches, wary of . . . judicial review of their decisions, might make them with an eye to avoiding litigation . . . rather than upon the basis of their own personal and doctrinal assessments of who would best serve the pastoral needs of their members." (*Ibid.*)

Applying these lessons, we conclude judicial review of Chapman's employment decision would absolutely result in excessive entanglement with religion. We would have to inquire into the good faith of the university's reasons for cutting back Schmoll's hours and adjudge the legitimacy of the church-affiliated institution's own perception of its ministerial needs. Such a review is constitutionally forbidden.[8]

### The Free Exercise Clause

Except for statutory exclusions not applicable here, FEHA cannot be read to exempt religious institutions from its restrictive prohibitions against discriminatory employment practices. Therefore, it clearly applies to Chapman's decision to alter the conditions of Schmoll's employment, setting it on a collision course with the university's right to free exercise of religion under the First Amendment. As stated in *Rayburn* v. *General Conf. of Seventh-Day Adventists, supra,* 772 F.2d at page 1168, "Any attempt by government to restrict a church's free choice of its leaders . . . constitutes a burden on the church's free exercise rights." We must decide the church/state contest by "balancing . . . the burden on free exercise against the 'impediment to . . . [the state's] objectives that would flow from recognizing the claimed . . . exemption.' [Citation.]" (*Ibid.*) As will be seen, we find no state interest compelling enough to override Chapman's interest in deciding how its chaplain can best serve the spiritual needs of the campus community.

---

[7]The *Rayburn* court noted, "Church personnel and records would inevitably become subject to subpoena, discovery, cross-examination, the full panoply of legal process designed to probe the mind of the church in the selection of its ministers." (*Rayburn* v. *General Conf. of Seventh-Day Adventists, supra,* 772 F.2d at p. 1171.)

[8]Schmoll argues there would be no excessive entanglement because neither clergy nor "high level administrators" participated in the decision to reduce her hours and the action was not of a pastoral character, but was assertedly purely economic. Our above discussion should make clear why these assertions must fail. (And see *Himaka* v. *Buddhist Churches of America* (N.D.Cal. 1995) 917 F.Supp. 698 [summary judgment appropriate in minister's title VII discrimination and retaliation claim based on the church's defunding of her department].) The dispositive fact is the existence of an employment decision by a religious institution about a clergymember employee. The courts do not cross that threshold.

The *Rayburn* case is instructive. The plaintiff, denied a pastoral position in her church, alleged sexual and racial discrimination. The federal appellate court affirmed a summary judgment in favor of the church because "state scrutiny of the church's choice would infringe substantially on the church's free exercise of religion . . . ." (*Rayburn* v. *General Conf. of Seventh-Day Adventists, supra,* 772 F.2d at p. 1165.)

The *Rayburn* court noted the "basic freedom" to believe according to the dictates of one's conscience "is guaranteed not only to individuals but also to churches in their collective capacities, which must have 'power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.' [Citation.]" (*Rayburn* v. *General Conf. of Seventh-Day Adventists, supra,* 772 F.2d at p. 1167.) It further observed, "The right to choose ministers without government restriction underlies the well-being of religious community, [citation], for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large." (*Rayburn* v. *General Conf. of Seventh-Day Adventists, supra,* 772 F.2d at pp. 1167-1168, fn. omitted.)

Acknowledging "the magnitude of the state's interest in assuring equal employment opportunities" (*Rayburn* v. *General Conf. of Seventh-Day Adventists, supra,* 772 F.2d at p. 1168), the court nonetheless found the balance tipped in favor of the church's free exercise protection. Summarizing the ministerial employee's responsibility to carry the church's message, it concluded there was overwhelming evidence the position was "important to the spiritual and pastoral mission of the church." (*Id.* at p. 1169.) Thus, the free exercise clause would tolerate no judicial inquiry into the reasons for Rayburn's rejection. (*Ibid.*)

Like the *Rayburn* court, we acknowledge the magnitude of the state's interest. FEHA was enacted out of the Legislature's recognition "that the practice of denying employment opportunity and discriminating in the terms of employment for [any of the statutorily prohibited] reasons foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advance, and substantially and adversely affects the interest of employees, employers, and the public in general." (Gov. Code, § 12920.) The statute "enunciates the state's public policy to eliminate discrimination by promoting 'the right to seek and hold employment free of prejudice.' " (*Soldinger* v. *Northwest Airlines, Inc.* (1996) 51 Cal.App.4th 345, 367 [58 Cal.Rptr.2d 747].)

But we must also recognize the significance of Schmoll's role at Chapman, which placed her front and center as a leader "important to the spiritual

and pastoral mission of the church." (*Rayburn* v. *General Conf. of Seventh-Day Adventists, supra,* 772 F.2d at p. 1169.) The lesson of *Rayburn* is that the court may no more examine the university's reasons for cutting back Schmoll's hours than it may supervise the content of the religious doctrine she expounds. (*Ibid.*)[9]

The same constitutional considerations apply to Schmoll's breach of contract and public policy claims. *Higgins* v. *Maher* (1989) 210 Cal.App.3d 1168 [258 Cal.Rptr. 757] illustrates the rule. The Court of Appeal affirmed the trial court's dismissal of a priest's complaint alleging wrongful termination, breach of implied covenant of good faith, invasion of privacy, defamation and intentional and negligent infliction of emotional distress against his bishop and diocese employer. The court observed, "[S]ecular courts will not attempt to right wrongs related to the hiring, firing, discipline or administration of clergy. Implicit in this statement of the rule is the acknowledgment that such wrongs may exist, that they may be severe, and that the administration of the church itself may be inadequate to provide a remedy. [But] [t]he preservation of the free exercise of religion is deemed so important a principle as to overshadow the inequities which may result from its liberal application. In our society, jealous as it is of separation of church and state, one who enters the clergy forfeits the protection of the civil authorities in terms of job rights." (*Id.* at p. 1175.)[10]

### Conclusion

Under the religion clauses of the First Amendment, Chapman was entitled to summary judgment as a matter of law. Even "apparently arbitrary decisions" of religious organizations affecting the status of their clergy employees must be free from judicial oversight. (*Young* v. *N. Ill. Conf. of United Methodist Church, supra,* 21 F.3d at p. 187.) As the court reasoned so well in *McClure* v. *Salvation Army, supra,* 460 F.2d at page 560, "[A]n investigation and review of such matters of church administration and government as a

---

[9]Relying on the California Supreme Court's decision in *Smith* v. *Fair Employment & Housing Com.* (1996) 12 Cal.4th 1143 [51 Cal.Rptr.2d 700, 913 P.2d 909], Schmoll argues a judgment adverse to Chapman would not affect its free exercise rights, but would simply make that exercise more expensive. (*Id.* at p. 1174.) *Smith* is inapt: It concerns a landlord's refusal to rent to an unmarried couple based upon her religious belief it would be sinful to do so. The case has nothing to do with the employment relationship between a religious institution and its minister.

[10]See also *Lewis* v. *Seventh Day Adventists Lake Region Conf., supra,* 978 F.2d 940, where the court dismissed a suit by a minister and his wife alleging breach of contract, promissory estoppel, intentional infliction of emotional distress and loss of consortium. The court affirmed the rule that "the First Amendment bars a civil court from intervening in an employment dispute between a church and its clergy." (*Ibid.*)

minister's salary, his [or her] place of assignment and his [or her] duty, which involve a person at the heart of any religious organization, could only produce by its coercive effect the very opposite of that separation of church and State contemplated by the First Amendment." The employment decisions of religious organizations about their clergy employees *"are per se religious matters and cannot be reviewed by civil courts . . . ."* (*Scharon* v. *St. Luke's Episcopal Presbyterian Hosp., supra,* 929 F.2d at p. 363, italics added.)

The judgment is affirmed. Chapman shall recover its costs on appeal.

Sills, P. J., and Bedsworth, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 16, 1999.