Filed 9/25/18

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| SARAH SUMNER, | C077302 |
| Plaintiff and Appellant, | (Super. Ct. No. 175786) |
| v. | |
| SIMPSON UNIVERSITY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Shasta County, Marlow, Judge.  Reversed in part and affirmed in part.

Sarah Sumner, in pro. per.; and Michael Cogan for Plaintiff and Appellant.

Vartain Law Group, Michael J. Vartain and Kathryn J. Burke Respondent for Defendants and Respondents.


"The First Amendment guarantees to a religious institution the right to decide matters affecting its ministers' employment, free from the scrutiny and second-guessing

1

of the civil courts." (*Schmoll v. Chapman University* (1999) 70 Cal.App.4th 1434, 1436 (*Schmoll*).) The so-called ministerial exception is "a 'nonstatutory, constitutionally compelled' exception to federal civil rights legislation. [Citation.] The idea is that the law should not be construed to govern the relationship of a church and its ministers." (*Hope Internat. University v. Superior Court* (2004) 119 Cal.App.4th 719, 734.) The Supreme Court has concluded that the ministerial exception bars a minister's employment discrimination suit based on the church's decision to fire her. (*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC* (2012) 565 U.S. 171, 196 [181 L.Ed.2d 650] (*Hosanna-Tabor*)) The Supreme Court has *not* decided whether the exception bars a breach of contract or tort action. (*Ibid.*) That is the issue we decide in this case.

Plaintiff Sarah Sumner was the dean of A.W. Tozer Theological Seminary (Tozer Seminary), which is part of defendant Simpson University in Redding, California. Although Sumner had a written employment agreement, her employment was terminated by Robin Dummer in his capacity as acting provost of the university on the ground Sumner was insubordinate.

In response to Sumner's complaint alleging breach of contract, defamation, invasion of privacy, and intentional infliction of emotional distress, defendants moved for summary judgment on the ground Sumner's employment was within the ministerial exception, an affirmative defense, and that as a result judicial review of her employment-related dispute is precluded by the First Amendment. The trial court agreed, and granted summary judgment.

Sumner argues the ministerial exception was not applicable because she was not a minister, and the facts were in dispute as to whether Simpson University was a religious organization. She argues that even assuming the ministerial exception is applicable, it does not preclude enforcement of her contract and tort claims.

2

As defendants who are moving for summary judgment based on the assertion of an affirmative defense, defendants had the burden to show that undisputed facts supported each element of the affirmative defense. (*Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 467-468; *Hosanna-Tabor, supra,* 565 U.S. at p. 195, fn. 4.) *Hosanna-Tabor* did not set forth the elements of the ministerial exception, but we derive from the cases that the following elements are required to successfully assert the ministerial exception as a defense to a contract claim. First, the employer must be a religious group. (*Id.* at pp. 176-177.) Second, the employee making the claim must qualify as a minister. (*Ibid.*) Third, the contract claim must be one that turns on an ecclesiastical inquiry or "excessive[ly] entangle[s]" the court in religious matters. (*Petruska v. Gannon Univ.* (3d Cir. 2006) 462 F.3d 294, 312.) We shall conclude the trial court correctly concluded that Simpson University is a religious organization and that Sumner is a minister for purposes of the ministerial exception, but that her contract cause of action is not foreclosed by the ministerial exception. Defendants have failed to show that resolution of Sumner's contract claim would excessively entangle the court in religious matters. However, her tort causes of action are part and parcel of the actions involved in her termination, and are therefore barred by the ministerial exception.

FACTUAL AND PROCEDURAL BACKGROUND

A. Facts Relevant to Simpson University Being a Religious Organization

Simpson University is a California religious corporation. It owns and operates the Tozer Seminary, which educates clergy. The Christian and Missionary Alliance (C&MA), an evangelical Christian denomination, sponsors three colleges and universities and one seminary in the United States. Simpson University is the western regional university of C&MA.

Simpson University is a party to the Affiliated Enterprise Agreement with C&MA, and is bound by the Affiliated Enterprises Regulations (Regulations). The Regulations provide in part that the purpose of the school is " 'to provide primarily for the ministerial

3

education needs of the [C&MA], thus preparing missionaries, pastors and other vocational church workers.' " All employees of Simpson University must affirm their commitment to Christ and sign and annually affirm the statement of religious doctrine of the C&MA.

The courses of the Tozer Seminary are religious in nature: Biblical studies, Christian counseling, communication and preaching, ministry leadership and administration, discipleship ministries intercultural studies, and theological and historical studies. During the relevant time period, the Tozer Seminary was under the leadership of the dean (Sumner), who reported to the provost of Simpson University, who reported to the president of Simpson University.

B. Facts Relevant to Sumner Being a Ministerial Employee

Sumner began working as dean of the Tozer Seminary on January 11, 2010. Sumner's written employment contract provided that she would receive a housing allowance in accordance with the regulation for clergy, and that for tax purposes she would be treated as self-employed clergy. The agreement also required her affirmation of acceptance of the Statement of Faith of the University. The job qualifications for the dean of Tozer Seminary included: "Commitment to Christ-centered Christian higher education in general[;]" "Be currently licensed with the [C&MA] or willing to be licensed[;] "Earned doctorate in ministry or related field, administrative experience, and theological education teaching experience[;]" and "Agree with the Statement of Faith of Simpson University."

Sumner also taught courses in the seminary while she was dean. She taught Old Testament, God Revelation and Humanity, Christ the Spirit and the Church, Events in Church History, Pursuing Wisdom, and Church and Society. All of the courses she taught were religious in nature. Sumner was licensed as a worker of the C&MA.

4

C.  Facts Relevant to Sumner's Termination

Sumner began working under an employment contract that stated: "Duties, rights, and privileges of administrative faculty are set forth in the Faculty and Staff Handbooks and the Academic Policy and Procedure Manual."  As dean, Sumner was part of the administrative faculty.  The faculty handbook provided:  "Assistant professors are awarded 3-year contracts, associate professors are awarded 5-year contracts, and full professors are awarded continuous contracts.  The assumption for faculty holding multi-year contracts is that a contract will be renewed at its expiration, unless conditions outlined in Section I.2, I.3, or I.5 have arisen."  Sumner alleged she was entitled to a continuous contract by virtue of her status as a full professor.  Section I.2 of the faculty handbook provided:

> "After due process, the Provost may dismiss a faculty member during an annual contract period for one or more of the following causes:
>
> "a.  Irreconcilable differences relating to the doctrinal statement to which the faculty member is required to subscribe.
>
> "b.  Conduct not in keeping with the moral standards of the University as described in the Faculty Handbook
>
> "c.  Failure to perform faculty responsibilities as prescribed in the Faculty Handbook.
>
> "d.  Gross professional incompetence that threatens the safety or reputation of the institution.  This is to be distinguished from the status of 'probation' . . . that institutes a grace period for remediation.
>
> "e.  Insubordination, the willful refusal to follow directives or perform work properly, as assigned by a supervisor.  Insubordination is not to be confused with academic freedom, as described in Section G.1."

Section I.3, fiscal exigencies, is irrelevant to the case, but Section I.5 provided in pertinent part:

"c. Performance reasons

"When substandard performance may jeopardize the renewal of a multi-year contract, clear notification and a probationary period will be given in accordance with the following guidelines: [¶] . . . [¶]

"B) The division chair and Provost will make the decision to place a faculty member on performance 'probation,' through the summative review process, 18 months before the end of the contract, or at any other time when evaluation measures so indicate. 'Probation' means contract renewal is in jeopardy for performance reasons. This status is clearly stated to the faculty member both verbally and in writing."

Sumner was terminated the first time on June 22, 2011. On June 6, 2011, Simpson University President Larry McKinney sent Sumner a letter complaining about the process Sumner used to gain support for her proposal that the seminary become an independent cost center, structurally distancing itself from Simpson University. McKinney's complaint was that Sumner had presented her concept to multiple people without first discussing it with him. He stated: "The actions I just cited are examples of circumventing your immediate supervisor, the Provost, the President, and the Chair of the Board of Trustees. These actions serve as examples of insubordination and disregard for authority. This is deeply troubling to me and is a pattern that cannot be repeated."

After the first termination, Sumner made a formal grievance. She alleged that her grievance was referred to an ad hoc grievance committee, which voted to reinstate her. She further alleged the results of the vote were relayed to defendant Dale Dyk, the chairman of the board of trustees of Simpson University. Sumner alleged that Dyk falsely reported to the board of trustees and to Sumner that the ad hoc grievance committee voted to uphold the termination. Dyk announced to the entire Simpson University community that the termination was final. McKinney, too, publicly stated that the ad hoc committee had voted to uphold the termination. Sumner also alleged McKinney accessed her emails after her termination and distributed selected emails to validate her termination.

6

Sumner was eventually reinstated to her former position. She and the Simpson University president, provost, and board of trustees agreed to certain provisions for reinstatement which included the establishment of a conciliatory process, the mutual expression of apology to appropriate parties, the agreement by Sumner to submit future proposals regarding the seminary to the provost for review, the agreement that the provost would serve as Sumner's exclusive supervisor and that her performance review would follow policies and procedures, the payment to Sumner of back pay and retirement benefits, and the repayment of Sumner's work-related out-of-pocket expenses incurred during her period of unemployment up to $12,000.

Following her reinstatement, Sumner began communicating with various Simpson University personnel, and urging them to tell "the truth" about her termination. Dummer wrote Sumner a letter on July 18, 2012, in which he stated Sumner had violated the protocols that Stanley Clark, the provost of Simpson University, had given Sumner when she was reinstated. The letter stated that one of the protocols was that Sumner would not send out any more group emails that were critical of the university leadership. Dummer stated that Sumner had violated this protocol. Dummer also stated that Sumner had violated the protocol that she not act beyond her scope of authority without advance approval of her supervisor. Dummer stated that the breaches of protocol constituted insubordination. Sumner alleged she had never been given a list of protocols. Dummer stated that Sumner had been instructed not to publicize any details of the conciliation process, yet she publicized that the president walked away from the negotiations and refused to participate further. Dummer offered that if Sumner would sign a list of stipulations, she would be placed on probation, rather than terminated.[1]

---

[1]     The proposed stipulations were as follows:

"1. You will not use email as a form of communication with persons affiliated with the University, in which the content is in any manner whatsoever related to your

By July 27, 2012, when Sumner had not responded to Dummer's letter, he terminated her employment. This action relates only to the second termination.

D. Proceedings Below

Sumner's first amended complaint alleged causes of action for breach of contract, gender discrimination and harassment, defamation, invasion of privacy, and intentional infliction of emotional distress. Sumner later dismissed the gender discrimination cause of action. Among the numerous affirmative defenses asserted by defendants was the allegation that the complaint was barred by the religion clauses of the First Amendment of the United States Constitution and article I of the California Constitution. The trial

---

opinions about your issues in your employment with Simpson University or your opinions about its leadership.

"2. You will not publicly communicate with persons affiliated with the University, in which the content is disparaging of Simpson University or its officers, trustees, faculty members, students, staff members, or church leaders, or of any one or more of them. [This does not limit you orally communicating in an in-person and private manner.]

"3. You will request and obtain the written permission of your supervisor (currently, me as Acting Provost), before inviting others apart from your immediate Tozer staff who report directly to you, to meetings or seminars or classes of any kind.

"4. You will comply with all other instructions that have or will come from your supervisor.

"5. You will comply with the directives you received on December 7, 2011 from Provost Clark, currently substituting my name for that of Provost Clark.

"6. You will not, in any other manner, exceed the authority that has been delegated to you.

"7. You will request permission of your supervisor before you engage in any action which arguable would be prohibited by 1, 2, 3, 4, 5 and 6 above, and you will comply with my response to your request.

"8. You will not aid or abet others to do that which would be prohibited by 1-7 for you to do."

8

court granted the defendants' motion to bifurcate and adjudicate the defendants' religion defenses first. Thereafter, defendants filed a motion for summary judgment or summary adjudication on the ground the action is barred by the religion clauses of the United States and California Constitutions.

The trial court granted the motion for summary judgment. The court decided that Simpson University was a religious organization, that Sumner was not a minister when employed as the dean of Tozer Seminary, that the ministerial exception nevertheless applied to Sumner's claims, and that all of Sumner's causes of action were barred by the ministerial exception. With respect to both Sumner's breach of contract cause of action and the torts causes of action, the trial court reasoned that they are intertwined with the employment decision of retaining or terminating Sumner, and all of the grounds for terminating her relate to ecclesiastical governance. The court found all the causes of action, "are so entangled with the organization's right to select its Dean of the Seminary and ecclesiastically govern its religious organization that it would be an impermissible church/state entanglement for this court to allow the causes of action to proceed."

DISCUSSION

I

Simpson University is a Religious Group for Purposes of the First Amendment

"The First Amendment provides, in part, that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.' . . . Both Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." (*Hosanna-Tabor, supra,* 565 U.S. 171, 181.) The United States Supreme Court in *Hosanna-Tabor* agreed with lower courts that there is a ministerial exception that precludes the application of legislation "to claims concerning the employment relationship between a religious institution and its ministers." (*Id*. at p. 188, fn. omitted.)

9

Among the factors courts consider when determining whether a party is a religious organization are whether the organization is for profit, whether it produces a secular product, whether it is affiliated with or supported by a church, whether its articles of incorporation mention a religious purpose, whether a formal religious entity participates in the management, whether the entity holds itself out as sectarian, whether worship is a regular part of its activities, whether it includes religious instruction in its curriculum, and whether the membership is made up of coreligionists. (*EEOC v. Townley Engineering & Mfg. Co.* (9th Cir. 1988) 859 F.2d 610, 619; *LeBoon v. Lancaster Jewish Comty. Ctr. Ass'n* (3d Cir. 2007) 503 F.3d 217, 226.)

Sumner concedes that Simpson University is a nonprofit corporation, and that it was organized as a Christian religious organization, but she argues it is only loosely associated with the C&MA, and that it has moved along a continuum from a religious to a secular institution. We agree with the trial court that on the facts presented, it is undisputed that Simpson University is a religious organization.

Simpson University has a formal, written affiliation with C&MA "in connection with the conduct of its Christian ministry activities[.]" The bylaws of Simpson University state that it is "a Christ-centered learning community" that is "committed to the worldwide work of The Christian and Missionary Alliance and shall operate within the framework of the policies of higher education as stated by The Christian and Missionary Alliance. [Simpson University] shall encourage the attendance of Christian and Missionary Alliance students and others who want to pursue Christian Education." Simpson University's bylaws provide that it "shall only employ individuals who: (a) profess a personal belief in Jesus Christ as personal Savior; and (b) are active members of a local Christian church." Employees must participate in Christian services sponsored by Simpson University, refrain from behavior that detracts from biblical standards as determined by Simpson University, and be able and willing to fulfill other ministry

10

functions. Simpson University is incorporated as a California nonprofit religious corporation.

Moreover, courts are generally in agreement that private, religious schools are a religious organization for purposes of the ministerial exception. In *Petruska v. Gannon Univ.*, *supra,* 462 F.3d 294, the Third Circuit held a private Catholic diocesan college was a religious institution for purposes of the ministerial exception. In *Kirby v. Lexington Theol. Seminary* (Ky. 2014) 426 S.W.3d 597 (*Kirby*), the Kentucky Supreme Court held that a seminary was a religious institution under the ministerial exception. Likewise, *EEOC v. Southwestern Baptist Theological Seminary* (5th Cir. 1981) 651 F.2d 277, held that a seminary owned, operated, and controlled by the Southern Baptist Convention was a religious institution. In California, *Hope Internat. University v. Superior Court*, *supra*, 119 Cal.App.4th at page 724, held that a university affiliated with the Church of Christ was a religious institution, and *Schmoll, supra,* 70 Cal.App.4th 1434, held that a university affiliated with the Christian church, Disciples of Christ, was a religious organization. Finally, the United States Supreme Court held a Lutheran school "offering a 'Christ-centered education' to students in kindergarten through eighth grade," was a religious organization. (*Hosanna-Tabor, supra*, 565 U.S. at p. 177.)

Considering the foregoing authority, we have no doubt that Simpson University qualifies as a religious organization for purposes of the ministerial exception.

II

Sumner Was a Ministerial Employee for Purposes of the Exception

The ministerial exception "applies to ministers and to a 'variety of nonordained employees with duties functionally equivalent to those of ministers.' " (*Hope Internat. University v. Superior Court, supra*, 119 Cal.App.4th at p. 734.) The Supreme Court has refused to adopt a rigid formula for deciding when an employee qualifies as a minister. (*Hosanna-Tabor, supra*, 565 U.S. at p. 190.)

11

*Hosanna-Tabor, supra*, 565 U.S. at pages 191-192, found it significant that the plaintiff was held out by the school as a minister, held herself out as minister, and had the title of minister, which involved significant religious training. Also significant were the plaintiff's job duties, which reflected a role in conveying the message of the church and in carrying out its mission. By contrast, Sumner was not a C&MA minister, but her position as dean required her to be licensed with the C&MA, and required a doctorate in ministry or a related field. Her job duties included teaching courses in religion and promoting the seminary through public appearances, including preaching.

*Hope Internat. University v. Superior Court, supra*, 119 Cal.App.4th at pages 736-737, noted that although education presents more conceptual difficulties when determining whether an employee is a minister for purposes of the exception, "where the school itself is a seminary—that is, *exclusively* preoccupied with religion and the training of a religion's own clergy as distinct from more general learning—the ministerial exception has been categorically applied to faculty, ordained or not."

In *Kirby, supra,* 426 S.W.3d 597, 603, 611-612, the Kentucky Supreme Court considered whether a tenured professor of a seminary was a minister for purposes of the exception. Like the United States Supreme Court, the Kentucky Supreme Court refused to adopt a rigid formula, but decided that even though the professor was not ordained, he was a minister because of his extensive involvement in the seminary's mission and religious ceremonies, and the subject matter of his teaching.

Part of Tozer Seminary's mission is to equip men and women for worldwide Christian service. Every faculty member of the seminary "is expected to live as a disciple-making role model for students." Sumner was hired to be the dean of the theological seminary. Among the qualifications for the job were: (1) commitment to Christ-centered Christian higher education and theological and missiological education; (2) being licensed with the C&MA; (3) being able to develop and maintain relationships with C&MA officers and personnel; (4) an earned doctorate in the ministry or related

field and theological education teaching experience; and (5) agreement with the statement of faith of Simpson University and the mission and values of the seminary.

The job description for the Tozer Seminary dean listed 20 "essential functions." Those functions that could be considered religious functions were:  (1) developing a vision for Tozer Seminary; (2) developing the curriculum; (3) promoting the seminary "through conferences, public appearances, preaching, and so forth[;]" (4) making contact and visits with church leaders to promote the seminary program; (5) representing the seminary at C&MA Council, and other C&MA conferences; (6) overseeing the "Spiritual Formation and Field Education experiences of all seminary students[;]" and (7) teaching classes.  Sumner taught courses in biblical and theological studies.[2]  Her employment contract noted that she would be given a housing allowance "in accordance with [the] regulation for clergy," and that for tax purposes she would be treated as self-employed clergy.  As indicated, Sumner was licensed as an official worker of the C&MA.

It was within Sumner's authority as dean of the seminary to change the curriculum, and she added and deleted certain religious courses from time to time.  All of the courses offered at Tozer Seminary were religious in nature.  Sumner had hiring authority for all the faculty at the seminary.  She considered religious issues in deciding who to appoint as a faculty member.  Sumner oversaw the team that provided the spiritual formation experiences of all seminary students.  Prior to becoming dean, Sumner earned a Ph.D. in theology.  In an application for alliance ministry that Sumner filed with the C&MA, she claimed that God had given her to be an evangelist, pastor, and teacher.  She claimed her spiritual gifts included evangelism, leadership, teaching, and pastoring.

---

[2]  Sumner taught the following seminary courses:  (1) Old Testament; (2) God Revelation and Humanity; (3) Christ the Spirit and the Church; (4) Events in Church History; (5) Pursuing Wisdom; and (6) Church and Society.

13

We conclude that even if many of Sumner's duties were administrative in nature, the school she was hired to administrate was "exclusively preoccupied with religion and the training of a religion's own clergy as distinct from more general learning . . . ." (*Hope Internat. University v. Superior Court, supra*, 119 Cal.App.4th at p. 737, italics omitted.) She was the visionary leader of the school, and was expected to demonstrate the values of Simpson University, which were largely religious in nature. As the leader of a school whose purpose was to offer a degree for pastors and ministry leaders seeking ordination, Sumner was a minister for purposes of the exception.

III

Contract Cause of Action

*Hosanna-Tabor* held that the ministerial exception barred a suit alleging discrimination in employment under antidiscrimination laws. (*Hosanna-Tabor, supra*, 565 U.S. at p. 188.) "The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful--a matter 'strictly ecclesiastical,' *Kedroff* [*v. St. Nicholas Cathedral of Russian Orthodox Church* (1952)] 344 U.S. [94], 119 [97 L.Ed. 120, 138], --is the church's alone." (*Id*. at pp. 194-195, fn. omitted.) Sumner initially asserted a cause of action for discrimination and harassment on the basis of gender, but has since dismissed that cause of action. However, *Hosanna-Tabor* specifically stated that it expressed "no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." (*Id*. at p. 196.)

Prior *to Hosanna-Tabor*, one California Appellate Court held that the ministerial exception prevented the court from deciding a cause of action for breach of an implied employment contract to terminate only for good cause. (*Schmoll, supra*, 70 Cal.App.4th at pp. 1437, 1444.) Schmoll, who was a minister and chaplain of Chapman University, had her hours reduced, ostensibly because of budget constraints. (*Id*. at p. 1436.)

14

Schmoll asserted the action was not financially motivated, but was in retaliation for telling school administrators about student complaints of sexual harassment by faculty. (*Ibid*.) The court held that the ministerial exception prevented it from deciding Schmoll's Government Code section 12940 (Fair Employment & Housing Act) claim because it would require the court to inquire into the good faith of the school's reason for cutting back Schmoll's hours. (*Schmoll,* at pp. 1440-1441.) The court held that it could not decide Schmoll's breach of implied contract to terminate only for good cause for the same reason. (*Id*. at p. 1444.) "[T]he court may no more examine the university's reasons for cutting back Schmoll's hours than it may supervise the content of the religious doctrine she expounds." (*Ibid*., fn. omitted.) However, in another case the same court acknowledged that churches exist within the civil community, and "are as amenable as other societal entities to rules governing property rights, torts and criminal conduct." (*Higgins v. Maher* (1989) 210 Cal.App.3d 1168, 1170.)

Other non-California cases have held that a contract action is not barred if interpretation of the contract does not require the court to resolve a religious controversy. In *Minker v. Baltimore Annual Conference of United Methodist Church* (D.C. Cir. 1990) 894 F.2d 1354 (*Minker*), a minister sued his church for age discrimination and breach of contract. The district court granted the church's motion to dismiss, but the appellate court, while agreeing that the minister's age discrimination claim was properly dismissed, held that one of the minister's contract claims could go forward. The contract claim that was properly dismissed was based on the church's breach of an alleged agreement set forth in the church's Book of Discipline, which provided that the church would make appointments without regard to, inter alia, age. (*Id*. at p. 1358.) The court held that it could not interpret or enforce this provision without running afoul of the First Amendment. (*Ibid*.) "The scope of the Church's purported duty to not discriminate in its ministerial appointments will inevitably require interpretation of provisions in the

Discipline that are highly subjective, spiritual, and ecclesiastical in nature." (*Id*. at p. 1359.)

But, the minister also asserted an agreement to provide him with a suitable pastorship at the earliest possible time. (*Minker, supra,* 894 F.2d at p. 1358.) The court stated: "A church is always free to burden its activities voluntarily through contracts, and such contracts are fully enforceable in civil court." (*Id.* at p. 1359.) The court noted that the Supreme Court has specified that courts may always resolve contracts governing " 'the manner in which churches own property, hire employees, or purchase goods.' " (*Ibid.,* quoting *Jones v. Wolf* (1979) 443 U.S. 595, 606 [61 L.Ed.2d 775].) "Even cases that rejected ministers' discrimination claims have noted that churches nonetheless 'may be held liable upon their valid contracts.' " (*Ibid*., quoting *Rayburn v. General Conference of Seventh-Day Adventists* (4th Cir. 1985) 772 F.2d 1164, 1171.) The court refused to dismiss the contract claim, stating, "the first amendment does not immunize the church from all temporal claims made against it." (*Id.* at p. 1360.) However, the court stated that the district court could grant summary judgment if in attempting to prove the minister's case, it was forced to inquire into matters of ecclesiastical policy as to the contract claim. (*Ibid*.)

Likewise, in *Petruska v. Gannon Univ., supra*, 462 F.3d 294, a university chaplain brought an action for discrimination, fraudulent misrepresentation, and breach of contract after she submitted her resignation on the belief she was about to be fired, and after the university had demoted her. (*Id*. at pp. 301-302.) The court held that the ministerial exception barred Petruska's discrimination claims, but not her fraudulent misrepresentation or contract claims. (*Id*. at pp. 309-312.) As to her contract claim, the court stated: "On its face, application of state contract law does not involve government-imposed limits on [the university's] right to select its ministers: . . . Enforcement of a promise, willingly made and supported by consideration, in no way constitutes a state-imposed limit upon a church's free exercise rights." (*Id*. at p. 310.)

16

As to whether Petruska's contract claim would result in an excessive government entanglement with religion, the court stated that entanglement may be substantive or procedural. (*Petruska v. Gannon Univ., supra*, 462 F.3d at p. 311.) "Therefore, courts typically consider the character of the claim, the nature of the remedy, and the presence or absence of a 'direct conflict between the . . . secular prohibition and the proffered religious doctrine.' " (*Ibid*.) The court made this analysis of Petruska's contract claim: "[T]he question is whether Petruska's breach of contract claim can be decided without wading into doctrinal waters. . . . Petruska's breach of contract claim 'do[es] not inevitably or even necessarily lead to government inquiry into [Gannon's] religious mission or doctrines.' [Citation.] Resolution of this claim does not turn on an ecclesiastical inquiry—or, at least not at the outset. If Gannon's response to Petruska's allegations raise issues which would result in excessive entanglement, the claims may be dismissed on that basis on summary judgment." (*Id*. at p. 312.)

Finally, Sumner cites to a post *Hosanna-Tabor* case from the Supreme Court of Kentucky, *Kirby, supra,* 426 S.W.3d 597, which held that breach of contract actions are not foreclosed by the ministerial exception. The plaintiff, Kirby, was a tenured professor at Lexington Theological Seminary. (*Id*. at p. 601.) Lexington's faculty handbook contained a detailed procedure for termination of tenured faculty, and provided tenured faculty could only be dismissed for " 'moral delinquency, unambiguous failure to perform the responsibilities outlined in [the faculty handbook], or conduct detrimental to the Seminary.' " (*Id*. at p. 603.) Kirby was terminated for financial reasons, after which he filed an action alleging breach of contract, breach of the implied duty of good faith and fair dealing, and discrimination based on race. (*Id*. at p. 603.)

Although the court held that the ministerial exception barred Kirby's racial discrimination claim pursuant to *Hosanna-Tabor*, it allowed the contract claim to go forward because the enforcement of the contract did not arouse concerns of government interference in the selection of the school's ministers and the contract did not involve

17

matters of ecclesiastical concern. (*Kirby, supra*, 426 S.W.3d at p. 615.) To the first of these points the court opined that, "Contractual transactions, and the resulting obligations, are assumed voluntarily. . . . [L]ike any other organization, a 'church is always free to burden its activities voluntarily through contracts, and such contracts are fully enforceable in civil court.' Surely, a 'church can contract with its own pastors just as it can with outside parties.' 'Enforcement of a promise, willingly made and supported by consideration, in no way constitutes a state-imposed limit upon a church's free exercise rights.' " (*Id*. at pp. 615-616, fns. omitted.) The court held that it was not meddling in the selection of ministers. (*Id*. at p. 616.) The seminary had voluntarily circumscribed its own conduct by entering into the contract, and the contract could be enforced according to its terms without breaching the institution's autonomy. (*Ibid*.)

As to whether applying the state's contract law would involve excessive government entanglement, the court stated that Kirby's breach of contract claims did not require an inspection or evaluation of church doctrine, but merely an application of neutral principles of law. (*Kirby, supra*, 426 S.W.3d at p. 619.) The court emphasized that the language of the contract regarding Kirby's tenure rights was unambiguous and did not require the court to "reach into church doctrine or polity." (*Id*. at p. 620, fn. omitted.)

The court was, however, unwilling to pronounce contract claims categorically outside the reach of the ministerial exception. (*Kirby, supra*, 426 S.W.3d at p. 620.) Kirby's claim was on a written contract with specific and unambiguous conditions. (*Ibid*.) The outcome might be different if the contract involved church doctrine or required a review of the religious qualification and performance of the minister. (*Id*. at pp. 620-621 & fn. 96.)

Although we agree with *Schmoll* that the ministerial exception would apply to an implied agreement to terminate only for good cause if the cause asserted is religious in

18

nature, to the extent that case stands for the proposition that all contract actions are barred by the exception, we disagree.

The stated reason for Sumner's dismissal was insubordination. Insubordination is specifically defined in the faculty handbook incorporated into Sumner's employment contract as: "the willful refusal to follow directives or perform work properly, as assigned by a supervisor." The stated instances of insubordination were: (1) several group emails critical of university leadership that Sumner sent out, in violation of the written protocol prohibiting such emails given to Sumner by Provost Clark and dated December 7, 2011; and (2) sending other emails regarding campus operations that violated the protocol that Sumner not act beyond the scope of her authority without the advance approval of her supervisor. However, Sumner alleged she was never given any list of protocols by Provost Clark or anyone else. Sumner's argument was that if she never received the protocols, she could not have been insubordinate for failing to follow them. This material fact was not resolved by the summary judgment motion.

Additionally, the faculty handbook provided faculty with certain grievance and appeal rights in the event of termination, which Sumner alleged defendants breached by failing to give her the process she was due. Whether she was given such process was not resolved by the summary judgment motion. Sumner also claims defendants agreed to reimburse her out-of-pocket expenses incurred following her first termination, and that they breached this agreement.

Sumner's breach of contract action is not barred by the ministerial exception. There is no dispute regarding the reason for Sumner's termination. Sumner's argument with defendants' stated reason for terminating her, insubordination, is that she could not have been insubordinate because that would require her to have refused to follow an order of her supervisor, and she was never given an order that she refused to follow. Furthermore, Sumner's actions that were claimed to have been insubordinate involved sending emails to the Simpson University community regarding her prior termination.

19

Reviewing Sumner's contract cause of action will not require the court to wade into doctrinal waters because review of the breach of contract claim does not require a review of Sumner's religious qualification or performance as a religious leader.[3] Defendants have never claimed to have terminated Sumner for religious reasons, only because she

---

**3**      Just before oral argument, respondents provided the court with six newly published decisions citing *Hosanna-Tabor*. At oral argument, counsel for respondents indicated these cases support the position that any breach of contract action, even if unrelated to religious doctrine, would unconstitutionally impose on the church's protected ministerial decisions. We disagree with respondents' characterization of these cases.

     In *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh* (3d Cir., Sept. 5, 2018, No. 17-3086) __ F.3d __ [2018 WL 4212091], the court of appeals affirmed summary judgment in the church's favor on the pastor's contract claim. The terms of the employment contract established that the pastor could be removed for failing in the role of spiritual leadership and furthering the mission of the church. (*Id*. at p. __ [2018 WL 4212091, p. *4].) The church claimed the pastor had breached the contract by failing to provide adequate spiritual leadership, as demonstrated by decreased church contributions and attendance during the pastor's tenure. (*Ibid*.) While the court indicated a willingness to expansively apply the ministerial exception to dismiss breach of contract claims, it's holding was circumscribed by the facts of the case before it. As such, the court held that the pastor's role "in causing decreased giving and reduced membership in the Church requires a determination of what constitutes adequate spiritual leadership and how that translates into donations and attendance—questions that would impermissibly entangle the court in religious governance and doctrine prohibited by the Establishment Clause." (*Id*. at p. __ [2018 WL 4212091, p. *5].) Here, by contrast, the stated reason for Sumner's termination was insubordination, and there is no indication from the facts presented that the resolution of the contract claims will involve church doctrine or Sumner's religious qualifications.

     *Puri v. Khalsa* (9th Cir. 2017) 844 F.3d 1152, 1162, does not assist defendants because it held the ministerial exception inapplicable in that the positions the plaintiffs asserted were being denied them were not ministerial positions. A case is not authority for a proposition not considered. (*People v. Avila* (2006) 38 Cal.4th 491, 566.)

     *Grussgott v. Milwaukee Jewish Day Sch., Inc*. (7th Cir. 2018) 882 F.3d 655; *EEOC v. R.G.* (6th Cir. 2018) 884 F.3d 560; *Penn v. N.Y. Methodist Hosp.* (2d Cir. 2018) 884 F.3d 416; and *Fratello v. Archdiocese of N.Y.* (2d Cir. 2017) 863 F.3d 190 did not involve breach of contract claims.

was insubordinate. Defendants voluntarily circumscribed their own conduct by entering into the contract with Sumner, and the contract can be enforced without breaching the institution's religious autonomy. (See *Kirby, supra*, 426 S.W.3d at p. 616.)

IV

Tort Claims

Sumner alleges three intentional tort claims: defamation, invasion of privacy, and intentional infliction of emotional distress.

Sumner's defamation claim alleges that false statements were made regarding the circumstances surrounding her first termination, and regarding the reasons and procedure for her final termination. Her invasion of privacy claim alleged that defendant Larry McKinney accessed her email account and shared the emails he found with his wife Debbie McKinney, Doug Swinburne (a member of Simpson University's board of trustees), Brad Williams (Simpson University's executive vice president), and Clark. Sumner's intentional infliction of emotional distress claim is simply based on her termination.

In *Gunn v. Mariners Church, Inc.* (2008) 167 Cal.App.4th 206, a worship director at a conservative evangelical Christian church brought an action for defamation, invasion of privacy, and intentional infliction of emotional distress after he was terminated for being gay. The church's policy was to confront anyone disqualified from leadership "and to tell anyone in the church who was immediately affected by the particular leader's ministry of the reason for his or her disqualification from church leadership." (*Id*. at p. 210.) In accordance with this practice, the church minister informed the congregation that Gunn had been terminated "because he had 'admitted to moral and sexual actions which according to the Bible, are sin and disqualify him from leadership and ministry in our church.' " (*Id*. at p. 211.) The minister told the congregation that Gunn "had been 'caught in a sin,' had admitted to 'moral and sexual actions that are sin,' had suffered 'a breakdown in character,' and was a 'broken man.' " (*Id*. at p. 216.) Gunn also

21

complained that individual defendants had falsely stated that Gunn had been asked repeatedly if he were gay, and he had lied and said he was not. (*Ibid*.) He claimed his privacy was invaded when the church staff and congregation were informed of his homosexuality after he had been terminated. (*Id*. at p. 214.) The court held that the determination of the truth of Gunn having sinned or being disqualified from leadership were not actionable because the determination would require a finding of what is or is not moral or sinful within the beliefs of the church. (*Ibid*.)

As to the other statements and actions, the court held the ministerial "exception applies to 'otherwise actionable claims of defamation and invasion of privacy, when based on statements "related to the hiring, firing, discipline or administration of clergy." [Citation.]' [Citation.] And that would encompass posttermination acts if they were part of the process of termination." (*Gunn v. Mariners Church, Inc.*, *supra*, 167 Cal.App.4th at p. 217.) The ministerial exception applies where the acts and statements are " 'part and parcel' " of the termination. (*Ibid*.)

Likewise in *Higgins v. Maher, supra*, 210 Cal.App.3d 1168, the court sustained the defendants' demurrer to claims of defamation, invasion of privacy, and intentional and negligent infliction of emotional distress. Higgins, a Roman Catholic priest, sued a Roman Catholic diocese and its bishop, Maher, after Higgins was removed from his church post and responsibilities. (*Id*. at pp. 1170-1171.) The allegations were that the Bishop accused Higgins of "social misconduct" and removed him in the presence of other priests, which was in violation of canon law, and authored a memorandum accusing Higgins of solicitation. (*Id*. at p. 1171.) After Higgins underwent a program of rehabilitation within the church, including electroshock therapy, he attempted to work in other church settings, but the church and Maher released information about his therapy and his past, causing him to lose those positions. (*Id*. at p. 1172.)

In considering Higgins's tort claims, the court refused to become involved because the actions of defaming Higgins, violating his privacy, and causing him emotional

22

distress were "part and parcel of the Bishop's administration of his ecclesiastical functions." (*Id.* at p. 1176.)  The court held that the accusations against Higgins pertained "directly to the ecclesiastical functions of the church." (*Ibid.*)  The torts were "inseparable parts of a process of divestiture of priestly authority." (*Ibid.*)  The court stated that although some torts cannot be perpetrated with civil impunity, such as battery or false imprisonment, in the context of the facts presented, the torts claimed were "simply too close to the peculiarly religious aspects of the transaction to be segregated and treated separately--as simple civil wrongs." (*Ibid.*)  "The making of accusations of misconduct; the discussion of same within the order; the recommendation of psychological or medical treatment; the infliction, whether intentionally or negligently, of emotional distress -- these are all activities and results which will often, if not usually, attend the difficult process by which priestly faculties are terminated.  If our civil courts enter upon disputes between bishops and priests because of allegations of defamation, mental distress and invasion of privacy, it is difficult to conceive the termination case which could not result in a sustainable lawsuit." (*Ibid.*)

We find the rationale of *Higgins v. Maher* persuasive.  The ministerial exception would become meaningless if the types of conduct alleged here were allowed to be actionable.  The statements that were alleged to have been defamatory, the invasions of privacy, and the actions causing distress were all "part and parcel" of the reasons for and process of terminating Sumner's employment.  It is true that the reasons given for terminating Sumner were not strictly religious.  Nevertheless, " 'the . . . First Amendment protects the *act of a decision* rather than a motivation behind it.  In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content.' [Citation.]" (*Schmoll, supra,* 70 Cal.App.4th at p. 1440.)

23

Were we to allow the acts taken in terminating Sumner to be framed as tortious acts, we would render the ministerial exception meaningless.[4]

V

Evidentiary Objection

Defendants objected to the admission of the declaration of Sumner's husband, Jim Sumner. He declared that he had attended a faculty meeting following Sumner's first termination, at which Simpson University's legal counsel had stated that Sumner's contract was binding. Defendants objected on the grounds the declaration was irrelevant, was inadmissible hearsay, was a legal conclusion, and was a lay opinion. The trial court sustained the objection without explanation. Sumner argues the declaration is relevant to her state of mind in entering into another contract, and is not hearsay because it was an authorized or adoptive admission, (Evid. Code, §§ 1221, 1222.) Defendants argue the declaration was irrelevant because of the ministerial exception.

It is possible the trial court excluded the evidence as irrelevant, since the sole basis of the summary judgment was the ministerial exception. Because we hold the ministerial exception does not bar Sumner's contract cause of action, and because we cannot know the trial court's ground for sustaining the objection, we conclude the objection should be overruled without prejudice to being raised again in light of the single cause of action going forward.

---

**4**     Sumner also argues the trial court treated the ministerial exception as a jurisdictional bar rather than an affirmative defense. We disagree. The difference is whether the court considers a plaintiff's allegations and asks whether the allegations and evidence entitle the plaintiff to relief, or whether the court decides it does not have the power to hear the case. (*Hosanna-Tabor, supra*, 565 U.S. at p. 195, fn. 4.) The trial court did not question its power to hear the case. Rather it decided that given the allegations and the undisputed facts, Sumner was not entitled to relief.

24

DISPOSITION

The summary adjudication of Sumner's breach of contract cause of action is reversed.  The summary adjudication of Sumner's other causes of action is affirmed.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


                         /s/
                      Blease, Acting P. J.


We concur:


  /s/
Butz, J.


  /s/
Renner, J.