Filed 12/6/21  Foley v. McElroy CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| J. PATRICK FOLEY,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>ROBERT W. McELROY, et al.,<br><br>Defendants and Respondents. | D077299<br><br><br>(Super. Ct. No. 37-2019-00048285-CU-DF-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Kenneth Medel, Judge.  Affirmed.

Law Offices of Carleton L. Briggs and Carleton L. Briggs for Plaintiff and Appellant.

Greene & Roberts, Maria C. Roberts, Lauren S. Cartwright; Niddrie Addams Fuller Singh and Rupa G. Singh for Defendants and Respondents.

## INTRODUCTION

J. Patrick Foley, a Roman Catholic priest, sued his diocese, the bishop, and two diocese employees for libel and intentional infliction of emotional distress after they answered media questions about a list of priests "credibly

accused" of child molestation.  The trial court granted the defendants' special anti-SLAPP (strategic lawsuit against public participation) motion to strike (Code Civ. Proc.,[1] § 425.16) and dismissed the action.  On appeal, Foley contends the court erred in finding he failed to demonstrate a probability of prevailing on his claims.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The Parties*

Foley is, and was at all times relevant to the underlying action, a Roman Catholic priest.  At one time he held an assignment within The Roman Catholic Diocese of San Diego (diocese or Diocese of San Diego), an ecclesiastical territory that includes San Diego County.[2]  Defendants indicate that Foley remains under the authority of the bishop of this diocese.

Robert W. McElroy has been the bishop of the Diocese of San Diego since 2015.  Rodrigo Valdivia and Kevin C. Eckery are both employees of The

---

[1]     All further unspecified statutory references are to the Code of Civil Procedure.

[2]     "The Roman Catholic Diocese of San Diego" was named as a defendant in the complaint.  Defendants submitted evidence that the Diocese of San Diego is not a legal entity but rather is a "canonical designation" that refers to "apostolic activity . . . within the specific geographical territory under the authority of the Office of the Bishop of San Diego."  Defendants further established that the legal entity with authority to "hold the temporalities and conduct the everyday business" of the Diocese of San Diego is "The Roman Catholic Bishop of San Diego, a corporation sole."  As the distinction drawn by Defendants is not material to the issues before us, and for the sake of consistency with the complaint, we refer to the "diocese" or the "Diocese of San Diego" within this opinion.  By doing so, however, we do not mean to signal disagreement with Defendants' assertions.

2

Roman Catholic Bishop of San Diego (see footnote 2, *ante*). The Diocese of San Diego, McElroy, Valdivia, and Eckery, were all named as defendants in the underlying action brought by Foley (collectively, Defendants).

## II.

### *Relevant Facts*[3]

In 1990, Foley was an adjunct professor at the University of San Diego (USD), which is within the Diocese of San Diego. On November 10, 1990, he was summoned to a meeting by then Bishop Robert Brom. Bishop Brom informed Foley that an adult male student had "voiced some concerns about [Foley's] professional behavior." These concerns allegedly involved Foley "touch[ing] one of his students inappropriately[.]"

Bishop Brom directed Foley to undergo an evaluation at a retreat house that, according to Foley, turned out to be a state mental health facility. Foley completed the evaluation and was "found to be mentally healthy and was deemed capable of returning to work," but afterward, Bishop Brom was purportedly unwilling to give Foley an assignment in the Diocese of San Diego.

In the summer of 1991, Foley accepted a position as a religious studies teacher and chaplain at the Christian Brothers High School in Sacramento. In 1995, he began a full-time ministry as an itinerant priest, "preaching parish missions and directing retreats across the country."

---

[3] Our factual summary reflects the relevant standard of review, which is de novo. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 (*Soukup*).) "We consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' [Citation.] However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.'" (*Ibid.*)

In June 2010, Bishop Brom informed Foley that a husband and wife in Sacramento had lodged a complaint with the diocese "regarding [Foley's] conduct with their son at some uncertain time." More specifically, according to Foley's complaint, the parents accused Foley of molesting their son in the early 1990s, when their son was a teenager.

According to the allegations of the complaint, Bishop Brom "reacted to the second accusation by ordering [Foley] to cease his priestly activities." Foley asserted in a declaration filed in the trial court that from June 2010 until December 2011, he was placed on administrative leave but was "*not* canonically suspended."

During this period of time, Bishop Brom convened a tribunal of three priests who were canon lawyers, and Foley faced a canonical trial over the parents' accusation. According to the complaint, the tribunal interviewed the alleged victim's parents, but not the alleged victim. Foley was represented in these proceedings by a canon lawyer who cross-examined the parents. Foley alleges the tribunal found him "not guilty"—its specific verdict was " 'non constat' "—and he thereafter resumed his ministry.

In 2015, after he was appointed bishop, McElroy stopped issuing letters of good standing to Foley. These letters are "required under the Charter for the Protection of Children which was adopted in the [Roman Catholic] Church in the United States for a priest to function outside of his diocese." According to Foley, Bishop McElroy acknowledged this "would effectively destroy [Foley's] ministry."

According to the complaint, on September 7, 2007, the Diocese of San Diego agreed to pay $198.1 million to settle 144 claims of child sexual abuse by clergy, purportedly the second largest settlement payment by a Roman Catholic diocese in U.S. history. The complaint alleges that "[p]erpetrators,"

4

apparently meaning perpetrators named in claims resolved by this settlement, "included 48 priests and one lay coordinator of altar boys." Although the allegations of the complaint are not clear, it appears a list of these perpetrators was compiled.

In 2018, after a Pennsylvania grand jury publicly issued a report finding that Pittsburgh-area priests had molested children, dioceses across the United States started "publish[ing] lists of their priests who had sexually abused minors, in order to promote transparency and public safety." The Diocese of San Diego "began a review of records of living and deceased priests who had been accused of abuse of minors, but who had not yet been added to the list of credibly accused priests that the Diocese created in 2007, to determine if those priests were credibly accused and should be added to the list."

In September 2018, the Diocese of San Diego added eight names, including Foley's, to a "list of all priests of the diocese against whom there were purportedly 'credible allegations' of child molestation."[4]

This development was the subject of two newspaper articles. The first was published on September 13, 2018, in the San Diego Union-Tribune. Photos of five priests, including Foley, were published alongside the article. The article opened with these statements: "The clerical sexual abuse scandal rocking the Roman Catholic Church hit home Thursday, as the Diocese of San Diego added eight priests to the list of those believed to have molested children. [¶] 'This is a response to the terrible moment we are in,' said Bishop Robert McElroy, citing a recent Pennsylvania grand jury report that found 1,000 children had been molested by Pittsburgh area priests there, and

_____

[4] The list itself was not put in evidence.

the resignation of Theodore McCarrick, who is accused of sexually assaulting altar boys, seminarians and priests. [¶] 'The cascade of emotions that this causes the survivors of the abuse as well as other people in the pews, has caused a tumult of anger, grief, upset, incomprehension, disillusionment,' McElroy said."

After identifying the eight priests whose names were added to the list, the article continued, "Thursday's announcement was prompted by the Pennsylvania grand jury report, the McCarrick case and other recent revelations that have called into question the church's moral authority and its willingness to honestly address this scandal. [¶] 'There is a broad call for transparency,' McElroy said. 'When we looked at it, we wanted to meet that as best we could.'"

The article quoted victim advocates' opinions about the revelation of additional accused predators. It reported that McElroy would be embarking on a " 'listening tour' " of the diocese, and quoted McElroy as saying, " 'I've met with a number of victims. . . . They are looking for – they are really looking for the perpetrator to say it to them, but often the perpetrator is dead – so they are looking for the church to say we are truly sorry for this.' "

The article then gave a short summary of the allegations against each of the eight priests. As to Foley, the article stated, "[i]n 2010, [Foley] was suspended from ministry pending a church trial on charges that he had abused two Sacramento-area boys, whose parents had been friends of the priest. [¶] The canonical trial ended in January 2011 without a clear verdict. 'He wasn't guilty,' said Rodrigo Valdivia, the San Diego diocese's vice-moderator of the curia, 'but that's not to say he was innocent.' His priestly faculties were restored until McElroy removed them in August 2015."

The article then quoted the opinions of various individuals about the newly disclosed allegations, and in closing noted that McElroy "argued that new measures taken by the diocese . . . have been effective" and said in his time as bishop the diocese had not had " 'a live case of a priest abusing minors.' "

The second article was published on September 16, 2018, in the San Jose Mercury News. It reported that "Catholic church leaders" had "taken the extraordinary step of promising to bare some of their darkest secrets by revealing previously undisclosed names of priests credibly accused of sexual abuse." This article focused on what it called the "disturbing fact" that Foley, an "itinerant Roman Catholic priest who holds Bay Area retreats," was one of those "identified as having been the subject of previously undisclosed accusations of sexual abuse." It stated: "The Rev. J. Patrick Foley, who held retreats in Soquel and Danville this year . . . faced a church tribunal after a couple in the Sacramento area accused him in 2010 of sexually molesting their boys, said San Diego diocese spokesman Keven C. Eckery. The tribunal was inconclusive, he said, and although church officials also alerted local police, nothing ever came of it. But the diocese in 2015 stripped him of his priestly faculties. [¶] 'When he couldn't be judged guilty in trial, it just complicated things with how to deal with him,' Eckery said."

The article attributed several other statements to Eckery, including: "Eckery said Foley was accused in Sacramento of molesting two children of a couple who had been his friends, but their boys did not testify at the church tribunal. . . . [¶] 'It wasn't just a closed church thing,' Eckery said. 'Both dioceses cooperated with police to make sure the family got justice.' " Eckery also was reported as having said Foley was stripped of his priestly faculties in August 2015 at the direction of the new bishop.

7

## III.

### *Trial Court Proceedings*

A.    *The Complaint*

On September 12, 2019, Foley sued McElroy, Valdivia, Eckery, and the Diocese of San Diego.  His complaint alleged two causes of action:  a first cause of action for "Defamation (Libel)," and a second cause of action for intentional infliction of emotional distress.

In a series of common allegations, the complaint gave a short factual account of the 1990 and 2010 accusations against Foley, the tribunal convened by Bishop Brom, and the "tribunal's final decision . . . that [Foley] was not guilty of any wrongdoing[.]"  The complaint alleged:  "On September 7, 2007, the Diocese had agreed to pay $198.1 million to settle 144 claims of child sexual abuse by clergy. . . . Perpetrators included 48 priests and one lay coordinator of altar boys.  In September 2018, eight more priests were added to this list, as well, including plaintiff.  This was the subject of newspaper articles published on September 13, 2018 and on September 16, 2018[.]"  Printouts of the articles from the internet editions of the San Diego Union-Tribune and the San Jose Mercury News were attached as exhibits and incorporated in the complaint by reference.

Under the heading "First Cause of Action [¶] Defamation (Libel)," Foley alleged that "[t]he September 13, 2018 and September 16, 2018 publications were made of and concerning the plaintiff and were so understood by those who read the publications," and that "[e]ach publication is false as it pertains to the plaintiff, and . . . made with the intent to harm plaintiff's personal reputation."  He further alleged:  "Each publication is libel per se, that is, libelous on its face.  It states directly or by implication, without further explanation, that plaintiff is a dangerous, possibly criminal, person.  Each publication exposes plaintiff to hatred, contempt, ridicule, and humiliation.

8

Communications to the press here were not made in connection with any ministerial or ecclesiastical matter, involved no proper function of the Church or its ministries, nor were they in furtherance of any ministerial objective or made to participants in any ministerial function. [¶] . . . The publications were seen or read on September 13, 2018 and September 16, 2018, respectively, and thereafter, by an unknown number of persons." Foley further alleged that "[e]ach publication" was unprivileged and proximately resulted in his loss of reputation and emotional harm.

The complaint's second cause of action for intentional infliction of emotional distress was based on Defendants' alleged defamation of Foley. In support of this cause of action, Foley alleged, in pertinent part, that "Defendants' conduct in publishing the false and defamatory material about plaintiff was intentional and malicious and done for the purpose of causing plaintiff to suffer . . . emotional and physical distress."

Based on these two causes of action, Foley sought recovery of general, special, and presumed damages.

B. *Defendants' Anti-SLAPP Motion to Strike the Complaint*

On November 4, 2019, Defendants filed a special anti-SLAPP motion to strike Foley's complaint. They argued it was a "quintessential" SLAPP suit brought to hinder their exercise of their right of free speech on a matter of "profound public interest – the protection and safety of children and the public," activities they argued were protected under section 425.16, subdivisions (e)(3) and (e)(4).

Defendants offered a number of reasons why Foley would be unable to meet his burden of establishing that his claims had at least minimal merit. They argued his cause of action for "Defamation (Libel)" failed to allege any false written statement made by any defendant, and that the only publications identified as libelous were the two news articles published by

9

the San Diego Union Tribune and the San Jose Mercury News, not by Defendants. They further argued the statements attributed to them in the articles had been communicated verbally, not in writing, and could not support a cause of action for libel, which requires a written publication.

Defendants further asserted the burden of proving falsity falls on the plaintiff where the statements relate to a matter of public concern, and that Foley would be unable to prove the statements attributed to them in the articles were false because their statements were substantially true. Finally, they argued their communications with the media were protected by the common interest privilege, Civil Code section 47, subdivision (c),[5] and barred by the ministerial exception.[6] They argued Foley's claim for intentional

---

[5]    Civil Code section 47 provides in pertinent part that a publication or broadcast is privileged if made: "(c) In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."

[6]    The ministerial exception arises from the principle that "[i]n our society, jealous as it is of separation of church and state, one who enters the clergy forfeits the protection of the civil authorities in terms of job rights." (*Higgins v. Maher* (1989) 210 Cal.App.3d 1168, 1175.) It is a " 'constitutionally compelled' " doctrine that "protects religious organizations from the normally attendant adverse consequences of employment discrimination." (*Henry v. Red Hill Evangelical Lutheran Church of Tustin* (2011) 201 Cal.App.4th 1041, 1053; see *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC* (2012) 565 U.S. 171, 188–189, 195.) It operates to preclude wrongful termination claims as well as " 'otherwise actionable claims of defamation . . . when based on statements "related to the hiring, firing, discipline or administration of clergy." ' " (*Gunn v. Mariners Church, Inc.* (2008) 167 Cal.App.4th 206, 217.) Although Defendants argued in part that the ministerial exception operates as a limit on the superior court's jurisdiction, it is more appropriately characterized as an affirmative defense. (See *Sumner v. Simpson University* (2018) 27 Cal.App.5th 577, 596, fn. 4.)

infliction of emotional distress was derivative of his defamation claim and was likewise deficient.

In support of their motion, Defendants submitted declarations of McElroy, Valdivia, and Eckery. Relevant here, McElroy averred that in 2010, a Sacramento couple informed the diocese "that their adult son reported being touched inappropriately by Father Foley when their son was a teenager." He asserted that Foley had faced a canonical trial over this accusation, and "[a]t the conclusion of the trial, the Tribunal hearing the case found the evidence inconclusive and did not find against Father Foley on the charges against him. The effect of the inconclusive findings was that Father Foley was neither exonerated, nor convicted of the charges."

McElroy averred that in 2018, many dioceses in the United States had published lists of their priests who had sexually abused minors "to promote transparency and public safety." In September 2018, the Diocese of San Diego similarly "published an updated list of all priests of the diocese who had been credibly accused of sexually abusing a minor." Foley's name was among those added to the list. McElroy stated he was questioned verbally about this development by a reporter with the San Diego Union Tribune and had provided truthful responses that reflected his "concerns and opinions about the problems that have plagued the Church in recent years." McElroy further averred his statements "were given for the purpose of truthfully describing actions being taken by the Diocese of San Diego to promote transparency and public safety, including the safety of children."

11

Valdivia holds a post-graduate degree in Canon Law from Catholic University and is an advisor to the bishop on matters of canon law.[7]  He averred, among other things, that in 2010, "we received a complaint made by a couple located in Sacramento, who reported that their adult son advised them he had been inappropriately touched by Father Foley . . . when he was a teenager."  Following a canonical trial, "the Judicial Vicar hearing the case found the evidence inconclusive and did not find against Father Foley.  The effect of the inconclusive findings was that F[ather] Foley was neither exonerated, nor convicted of the charges against him."

Valdivia further stated that in September 2018, following a "review of prior accusations made, including accusations . . . against Father Foley," "the names of 8 priests were added to the existing list of priests in the Diocese who had been credibly accused of abusing minors."  Valdivia responded to questions about this development from a reporter with the San Diego Union Tribune.  He asserted that his responses were truthful, were communicated verbally, and were "made in an effort to promote transparency and public safety, especially that of children."

Eckery averred that "following the release of a very public Pennsylvania Grand Jury Report," the diocese "began a review of records of living and deceased priests who had been accused of abuse of minors[.]"  Following this review, the diocese added the names of several priests, including Foley, to "its list of priests who had been credibly accused of abusing minors."  Eckery, who is responsible for communications and public

---

[7]    Valdivia explained that "[t]he canons of the Catholic Church are generally the laws and legal principles made and enforced by the authorities of the Church to regulate its external organization and government and to order and direct the activities of Catholics toward the mission of the Church."

affairs on behalf of the diocese, was contacted by a reporter from the San Jose Mercury News about a week after the list was updated. Eckery communicated with the reporter verbally, gave responses that were "truthful based on information available to [him]," and communicated with the reporter in the interest of "promoting transparency and . . . public safety, including the safety of children."

C.    *Foley's Opposition to the Anti-SLAPP Motion*

In opposition to Defendants' motion, Foley conceded that his claims arose from Defendants' protected speech activities, such that the first anti-SLAPP prong was met. He argued, however, that he could establish a probability of prevailing on his claims.

Foley asserted, among other things, that he had stated a legally sufficient cause of action for libel against the Defendants because, so he claimed, "the Complaint alleges that the list of 'Credible Allegations – Priests of the Diocese of San Diego' posted on a public website and provided to the press was itself defamatory" and that "[t]he list was written and the contents of it were then republished." He argued that "placing [his] name on the list" was defamatory in that it was "a provably false factual assertion." He maintained that the "falsity" of adding his name to the list was demonstrated by the tribunal verdict of " 'non constat,' " which he argued was akin to an exoneration. He also took issue with Defendants' reliance on the common interest privilege and ministerial exception.

The only evidence Foley offered in opposition to the anti-SLAPP motion was his own declaration, which contained 13 paragraphs of text and had no attached exhibits. In this declaration, Foley asserted that in 1990, a male student at USD had "voiced some concerns about my professional behavior," and in 2010, a husband and wife from Sacramento "lodged a complaint regarding my conduct with their son[.]" He did not specify the nature of the

13

alleged misconduct, nor did he state he had been falsely accused or otherwise assert his innocence of the allegations against him.

Paragraphs 5 and 6 of Foley's declaration were the only paragraphs of his declaration in which he addressed either the credibility of the accusations against him, or the tribunal and its verdict. Paragraph 5 stated:

> "During the time I was on administrative leave [from June 2010 to December 2011], a tribunal of canon lawyers examined the 2010 complaint. I was represented by a canon lawyer who cross-examined the parents who made the Complaint. The testimony of the couple was rejected by the tribunal as not credible because they gave conflicting accounts of the alleged incident. The son who was the alleged victim refused to have anything to do with the canonical trial. The parents had a dozen other lawsuits against other businesses and individuals at the time. Ultimately, the tribunal reached a verdict of 'non constat,' meaning the allegations under review had not been proven. 'Non constat' literally means 'it is not established' or 'it is not agreed' and is the equivalent to a verdict of 'not guilty' in the American justice system."

In paragraph 6, Foley stated: "The Sacramento Police Department conducted its own investigation in the early months of the tribunal's investigation, but took no action. After the tribunal's investigation was concluded and the 'not guilty' verdict validated by Rome, no civil, criminal or canonical action was taken against me."

In the remainder of his declaration, Foley conveyed his belief that Bishop Brom and Bishop McElroy had taken actions that showed they harbored a vendetta against him, and he described the difficulties he experienced after the diocese added his name to the list of credibly accused priests.[8]

---

8     The copy of Foley's declaration in the record on appeal is unsigned. There appear to be large blank areas overlaying the date and signature portions of the declaration, suggesting something about the duplication or

D.    *Defendants' Reply to Foley's Opposition*

Defendants filed evidentiary objections to Foley's declaration.  They divided his declaration into 14 sections of text and asserted between three and six objections to each section.  Relevant here, they argued that paragraph 5 was inadmissible because Foley's assertions lacked foundation, were based on hearsay, contained improper lay opinion, were irrelevant, speculative, and/or violated the so-called best evidence rule.  They asserted that paragraph 6 was inadmissible because it lacked foundation, contained hearsay and improper expert opinion testimony, and was irrelevant.

Concurrently with their reply, Defendants also filed a supplemental declaration of Valdivia.  Foley objected to the court's consideration of the supplemental declaration, arguing it was new evidence improperly submitted in reply.[9]

---

transmission of the document may have affected these parts of the signature page.  Since the lack of a signature was not raised as an issue during the trial court proceedings or on appeal, we assume the original was signed and that the apparent lack of signature on our copy is due to a duplication error.

[9]    The trial court overruled this objection.  On appeal, Foley argues the trial court abused its discretion because new evidence generally cannot be submitted with reply papers unless it is offered to clarify an ambiguity or fill a gap created by the opposition.  (See *Jay v. Mahaffery* (2013) 218 Cal.App.4th 1522, 1537 (*Jay*); see also *Park v. First American Title Co.* (2011) 201 Cal.App.4th 1418, 1427 (*Park*) [trial court's evidentiary ruling is reviewed for an abuse of discretion].)  Although this case is not as extreme as *Jay*, in which the defendants waited until their reply to file any evidence, we agree the evidence submitted with Valdivia's supplemental declaration was not a gap filler or strictly responsive to an ambiguity created by Foley's opposition.  Rather, it provided additional evidence of the tribunal verdict, a topic Valdivia addressed in his moving declaration.  Defendants reasonably could have anticipated the need for this evidence at the time they filed their moving papers.  We agree it should have been excluded and, therefore, we do not consider this evidence.

15

E.      *Trial Court Ruling Granting Defendants' Anti-SLAPP Motion*

Prior to the hearing on the anti-SLAPP motion, the trial court issued a tentative ruling announcing its intent to grant the motion. At the start of the hearing, the court explained that its tentative was based on "the provability of the case . . . your primary cause of action is libel, and . . . most of the things either involve opinion or truthful accounting of what occurred." After hearing arguments from counsel, the court confirmed its tentative ruling, emphasizing the lack of evidence "that false statements were made" and concluding that Defendants' statements were either opinions or "recitations of what happened in certain procedures that [Foley] may not have liked . . . but that doesn't amount to defamation[.]"

In a minute order issued after the hearing, the court sustained several of Defendants' objections to Foley's declaration, as a result of which several paragraphs, including paragraphs 5 and 6, were ruled inadmissible. The court overruled all other objections. The court granted the anti-SLAPP motion and found that "[t]he challenged action arises from speech on matters of public interest" and that Foley had not met his burden to show he had a probability of prevailing "on the claim [*sic*]." On January 16, 2020, the trial court entered judgment in favor of Defendants. On February 13, 2020, Foley filed a notice of appeal.[10]

---

[10]     An order granting or denying an anti-SLAPP motion is independently appealable (§§ 425.16, subd. (i), 904.1, subd. (a)(13)), and thus "we are foreclosed from reviewing that order on appeal from the judgment." (*Maughan v. Google Technology, Inc.* (2006) 143 Cal.App.4th 1242, 1247.) In his notice of appeal, Foley stated he was appealing from the "judgment or order" entered on January 16, 2020, the date the trial court entered judgment, and he attached a copy of the judgment, but not the order, to the notice. However, we must construe a notice of appeal liberally. (Cal. Rules of Court, rule 8.100(a)(2); *Luz v. Lopes* (1960) 55 Cal.2d 54, 59 ["notices of appeal are to be liberally construed so as to protect the right of appeal if it is

16

Foley contends the trial court erred by granting Defendants' anti-SLAPP motion. He does not dispute that Defendants met their initial burden of demonstrating that his action arises from their protected speech activities. He argues, however, that he met his second-prong burden of showing a probability of prevailing on his claims. We disagree and affirm.

## I.

### *Relevant Legal Principles*

"A SLAPP suit, or a strategic lawsuit against public participation, is one that seeks to chill a party's valid exercise of constitutional rights to free speech and to petition for redress." (*Citizens of Humanity, LLC v. Hass* (2020) 46 Cal.App.5th 589, 597.) Section 425.16, the anti-SLAPP statute, provides in pertinent part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) The anti-SLAPP law "provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).)

---

reasonably clear what appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced"].) It is reasonably clear that Foley intended to appeal the order granting Defendants' anti-SLAPP motion, and the appeal would have been timely as to that order. Accordingly, we construe the appeal as properly brought from the order granting the anti-SLAPP motion.

An anti-SLAPP motion is evaluated in two steps. "At the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them. . . . If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached. There, the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken. Allegations of protected activity supporting the stricken claim are eliminated from the complaint unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing." (*Baral*, *supra*, 1 Cal.5th at p. 396.)

## II.

*Foley Concedes Defendants Met Their Initial Burden and Seeks Review Only of the Determination That He Failed to Meet His Burden to Successfully Resist the Anti-SLAPP Motion*

To meet its threshold burden, the moving defendant need only establish that the claims against it arise from speech activities that fall within "one of the categories listed in section 425.16, subdivision (e)." (*Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 882 (*Medical Marijuana*).) In the trial court, Defendants argued Foley's action arose from their communications with the press about the updated list of credibly-accused priests, which they asserted were speech activities concerning a matter of public interest such that they were protected under subdivisions (e)(3) or (e)(4) of section 425.16. (See § 425.16, subds. (e)(3) [protecting "any written or oral statement or writing made in a place open to the public or a public

18

forum in connection with an issue of public interest"], (e)(4) [protecting "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest"].) Foley conceded the issue, and the trial court ruled "[t]he challenged action arises from speech on matters of public interest."

As noted, Foley does not challenge this determination on appeal. We agree with the court's resolution of this issue, which is supported by case law. (See, e.g., *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1548–1551 [defendants' communications relating to "protection of children in church youth programs" from molestation or other inappropriate relationships initiated by adult church leaders were communications about matters of public significance by section 425.16, subdivision (e)(4)].)

Thus, this appeal only requires us to decide whether the trial court reached the correct result at the second step of the anti-SLAPP analysis. At this step, the burden shifts to the plaintiff to demonstrate "there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) This is a " 'summary-judgment-like procedure.' " (*Baral*, *supra*, 1 Cal.5th at p. 384; see *College Hospital, Inc. v. Superior Court* (1994) 8 Cal. 4th 704, 718–719 [section 425.16 and similar motions operate "like a demurrer or motion for summary judgment in 'reverse' "].) "The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." (*Baral*, at pp. 384–385.) " '[C]laims with the requisite minimal merit may proceed.' " (*Id.* at p. 385.)

We evaluate the trial court's resolution of this issue de novo. (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3 ["Review of an order granting or denying a motion to strike under section 425.16 is de novo."].) We review the trial court's decision, not its rationale. If the court's order "is correct on any theory applicable to the case, we may affirm the order regardless of the correctness of the grounds on which the lower court reached its conclusion." (*City of Alhambra v. D'Ausilio* (2011) 193 Cal.App.4th 1301, 1307.)

III.

*Foley Fails to Establish That His Libel Claim Is Both Legally Sufficient and Factually Substantiated*

On our de novo review, we conclude Foley fails to meet his second-step burden of establishing a legally sufficient and factually substantiated libel claim.

A.   *Foley Fails to Demonstrate That His Allegations of Libel Were Sufficient*

1.   *Relevant Legal Principles*

The requirement of legal sufficiency necessitates a properly-pled claim. "If the pleadings are not adequate to support a cause of action, the plaintiff has failed to carry his burden in resisting the motion." (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 31 (*Gilbert*), citing *Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1018–1019 (*Vogel*).) Moreover, " '[a] plaintiff cannot avoid [an anti-]SLAPP motion by amending the complaint.' " (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1263.) Nor will a court of review indulge unsupported interpretations of the complaint and thereby effectively "redraft[] . . . [the] complaint in order to read that document as alleging conduct . . . *that has not in fact been specifically alleged*[.]" (*Medical Marijuana*, *supra*, 46 Cal.App.5th at p. 883.) Rather, "[w]e must take the

complaint as it is." (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2006) 136 Cal.App.4th 464, 476.)

Defamation occurs either through libel or slander. (Civ. Code, § 44.) " 'The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage.' " (*John Doe 2 v. Superior Court* (2016) 1 Cal.App.5th 1300, 1312.) Libel is defamation based on a publication in writing or other fixed, visible representation. (Civ. Code, § 45; see *Medical Marijuana*, *supra*, 46 Cal.App.5th at p. 884.) Slander is defamation based on an oral utterance. (Civ. Code, § 46.)

Both libel and slander have special pleading requirements. Because defamation "is not committed unless the defamatory matter is 'published' or communicated to a third person[,] . . . publication must be pleaded." (5 Witkin Cal. Procedure (5th ed. 2008) Pleading, § 740, p. 160.) Further, " '[t]he general rule is that the words constituting an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint.' " (*Medical Marijuana*, *supra,* 46 Cal.App.5th at p. 884, quoting *Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1612, fn. 5 (*Kahn*).) The pleading requirements for slander are less strict, but even when pleading slander, "the substance of the defamatory statement" must be alleged. (*Okun v. Superior Court* (1981) 29 Cal.3d 442, 458 (*Okun*).) No matter the theory of defamation, the complaint must be alleged with sufficient certainty to " 'acquaint [the] defendant with what he must defend against.' " (*Medical Marijuana*, at p. 894, quoting *Albertini v. Schaefer* (1979) 97 Cal.App.3d 822, 832–833; see also *Okun*, at p. 458 [discussing pleading requirements for slander; stating the complaint must "give[ ] notice of the issues sufficient to enable preparation of a defense"].)

21

2.    *Analysis*

Defendants argued in the trial court that the complaint was insufficient because it alleged no libelous statements by them at all, much less the required verbatim recitation. They further argued that the only publications it identified as defamatory were the two news articles, which were plainly published by the San Diego Union Tribune and the San Jose Mercury News, not by them.

In response, Foley asserted "the Complaint alleges that the list of 'Credible Allegations – Priests of the Diocese of San Diego' posted on a public website and provided to the press was itself defamatory. The list was written and the contents of it were then republished." There is no other way to put it: this was a mischaracterization of the complaint. The complaint's only reference to a "list" appeared in the common allegations, where Foley alleged that "[i]n September 2018, eight more priests were added to *this list*, as well, including plaintiff." (Italics added.) Not only was it unclear what "list" the complaint was referring to since no list had previously been identified, but the complaint did not provide the list's title or indicate that it had been published. More to the point, the list was not identified as one of the defamatory publications on which Foley's cause of action for "Defamation (Libel)" was based. The party resisting an anti-SLAPP motion bears the burden of establishing the legal sufficiency of his pleading. (*Gilbert*, *supra*, 147 Cal.App.4th at p. 31.) Foley failed to do this, and on this ground alone, the trial court would have been justified in striking the claim. (*Id.* at p. 32.)

On appeal, Foley does not address the legal sufficiency or insufficiency of his libel claim in his opening brief. He does, however, offer up a host of new contentions about the defamatory statements on which the claim is purportedly based. He now asserts that adding his name to the list of credibly-accused priests was impliedly as well as directly defamatory because

22

it suggested he was like the other individuals on the list who were, so he argues, "actual abusers." He also claims for the first time that numerous statements that the articles attributed to McElroy, Valdivia, and Eckery were directly and impliedly false. We discuss these newfound theories of libel in greater detail below.

In response, Defendants point out that Foley neglected to address his second-step burden to show a legally sufficient claim. They reiterate that his complaint does not minimally plead a written statement by any defendant, much less the verbatim recitation required for a valid libel claim, that the only publications identified in support of the claim are the two news articles published by the San Diego Union Tribune and the San Jose Mercury News, and that the statements attributed to them within the articles were verbal, not written, and cannot support a claim for libel.

Foley responds in his reply brief that the complaint's allegations of libel were sufficient. He contends that by labeling his first cause of action "Defamation (Libel)," he disclosed that "the challenged falsities were reduced to writing in the form of newspaper quotes and restatements." He argues he sufficiently alleged Defendants' defamatory statements by "expressly incorporat[ing] and attach[ing] [to the complaint] the actual newspaper articles, which do contain the verbatim attributions challenged here[.]" He also appears to contend that a plaintiff does not need to show compliance with the pleading standards for libel to survive an anti-SLAPP motion.

We reject Foley's arguments and conclude he fails to demonstrate an adequately pled libel claim. "The general rule is that the words constituting an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint." (*Kahn, supra*, 232 Cal.App.3d at p. 1612, fn. 5.) Contrary to Foley's argument otherwise, this pleading rule applies in an anti-SLAPP

23

motion. (See *Medical Marijuana*, *supra*, 46 Cal.App.5th at p. 893 [anti-SLAPP motion challenging libel cause of action; quoting *Kahn*, at p. 1612, fn. 5]; *Vogel*, *supra*, 127 Cal.App.4th at p. 1017, fn. 3 [same]; *Gilbert*, *supra*, 147 Cal.App.4th at p. 31 [anti-SLAPP motion challenging defamation cause of action; quoting *Vogel*, at p. 1017, fn. 3, which quoted *Kahn,* at p. 1612, fn. 5].) A libel cause of action alleged without the requisite specificity does not meet the requirement of demonstrating a legally sufficient claim. (*Gilbert*, at p. 32.) Also, because the complaint delimits the issues to be considered on an anti-SLAPP motion, the failure to allege Defendants' defamatory statements also justifies this court in "disregarding any evidence or argument concerning statements not explicitly set forth in the complaint." (*Vogel*, at p. 1017, fn. 3.)

We also disagree with Foley's assertion that he sufficiently identified Defendants' allegedly defamatory statements by simply attaching the news articles to the complaint. In *Medical Marijuana*, *supra*, 46 Cal.App.5th 869, we squarely rejected the possibility of pleading libel in this manner. There, we reviewed the denial of an anti-SLAPP motion challenging a libel cause of action premised on asserted inaccuracies in a 25-page article. (*Id.* at p. 885.) The allegations of the operative complaint identified two such misstatements. (*Ibid.*) On appeal, plaintiffs sought to bolster the merits of their claim by identifying another 19 purported inaccuracies in the articles that were not alleged in the complaint. (*Id.* at p. 892.) They argued " '[i]t was . . . unnecessary to recite each challenged statement in the pleading because the entire [Article] was attached to the [operative] complaint.' " (*Id.* at p. 894.) We "unequivocally reject[ed]" this position. (*Ibid.*) We emphasized that a libel charge requires a verbatim recitation of the allegedly offensive communication, and that no matter the theory of defamation, the plaintiff is required to " '*allege[ ] the substance of the defamatory statement*.' " (*Id.* at p.

893, italics added.)  Plaintiffs had not "quoted, identified, mentioned or otherwise referenced" the 19 statements in the allegations of their complaint, nor had they "even highlighted, underlined, or otherwise identified" them in the copy of the article attached as an exhibit to the complaint.  (*Id.* at p. 892, fn. 14.)  We stated "the requirement that the allegedly defamatory statement be set out verbatim does not permit a plaintiff to attach an entire multi-page article to a complaint without identifying the specific defamatory matter on which the plaintiff is relying and expect the defendants (and the court) to ferret out the purportedly false statements with no guidance whatsoever from the plaintiff." (*Id.* at pp. 894–895.)  Because the boundaries of the issues to be considered on an anti-SLAPP motion are delimited by the pleadings, we concluded plaintiffs could not rely on the 19 newly-identified statements that did not appear in the complaint's allegations to establish a probability of prevailing on their libel claim.  (*Id.* at p. 895.)

Our analysis and conclusion in *Medical Marijuana* compel us to reject Foley's argument that he complied with the pleading requirements for libel by simply attaching copies of the two news articles to the complaint. Although the articles spanned a total of 10 pages, fewer than the 25-page article at issue in *Medical Marijuana*, it is still the case that attaching 10 pages of material to a complaint is an insufficient means of alerting Defendants to the purportedly defamatory statements for which they are being sued.  Like the plaintiffs in *Medical Marijuana*, Foley neither "quoted, identified, mentioned or otherwise referenced" nor "highlighted, underlined, or otherwise identified" them in the attached articles.  (*Medical Marijuana, supra,* 46 Cal.App.5th at p. 892fn. 14.)  Worse, Foley confusingly accused Defendants of libel despite the absence of any writings attributed to them, and he identified the "publications" at issue as the news articles though they

25

plainly had been published by others.  Foley's deficient pleading made identification of the basis for his libel claim a matter of guesswork.  We disagree that such misdirected and uncertain allegations are adequate to sufficiently plead a claim for libel against the Defendants.

Foley contends that notwithstanding any uncertainty in his pleading, Defendants showed they "plainly understood" which of their statements were at issue insofar as they tried to anticipate and defend certain statements in their motion.  We disagree that the record reveals any such plain understanding.  If anything, the effort to identify the basis for Foley's claim has been more akin to a shell game.  In their moving papers filed in the trial court, Defendants argued that certain quotes or statements from the news articles that are attributed to McElroy, Valdivia, and Eckery were unactionable opinions or were not false.  In response, Foley took the position that his libel claim was based on a different publication altogether—the list of credibly-accused priests.  On appeal, Foley has expanded the basis for his claim even further to include not only the list of credibly-accused priests, but also statements and quotes attributed to McElroy, Valdivia, and Eckery— only some of which Defendants attempted to defend in the trial court.  As this progression demonstrates, there has never been a fixed understanding of the basis of Foley's libel claim.  Rather, the record suggests he has sought to capitalize on the complaint's ambiguity by shifting his theories of liability in response to Defendants' arguments.

We conclude that Foley fails to establish an adequately pled, and thus legally sufficient, libel claim.  Although "we could well stop here" (*Gilbert*, *supra*, 147 Cal.App.4th at p. 32), we observe that Foley also failed to factually substantiate the claim.

26

B. *Foley Fails to Demonstrate That He Substantiated His Libel Claim with Competent, Admissible Evidence*

To resist Defendants' anti-SLAPP motion, Foley was required not only to establish a legally sufficient claim but also to factually substantiate his libel claim, meaning he needed to make "a prima facie factual showing sufficient to sustain a favorable judgment." (*Baral*, *supra*, 1 Cal.5th at pp. 384–385.) This showing could be made only through "competent admissible evidence." (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940 (*Sweetwater Union*).) As we discuss, Foley's showing fell short, because he relied on a theory of libel that was not tenable, and his only evidence on the critical element of falsity was ruled inadmissible.

" ' "The sine qua non of recovery for defamation . . . is the existence of a falsehood." ' " (*Medical Marijuana*, *supra*, 46 Cal.App.5th at p. 884.) And "[w]here a case involves matters of public interest, the plaintiff, even a private figure plaintiff, bears the burden of proving that the statements at issue are false." (*Id.* at p. 888, fn. 12; see *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 747 ["When the speech involves a matter of public concern, a private-figure plaintiff has the burden of proving the falsity of the defamation."]; *Nizam-Aldine v. City of Oakland* (1996) 47 Cal.App.4th 364, 373–375 [plaintiff bears this burden even in a case involving a nonmedia defendant].) For purposes of defamation, there are "no precise boundaries defining an issue of public importance." (*Gallagher v. Connell* (2004) 123 Cal.App.4th 1260, 1275.) "[F]or a matter to be of public interest in the defamation context it must be of concern to a large segment of the populace as opposed to a small fragment having a special interest." (*Ibid.*) The diocese's issuance of the updated list of priests credibly accused of child molestation, and the statements attributed to Defendants within the news

27

articles, easily fit this description. (See *ibid.* [concluding that whether a parish priest took unfair advantage of an elderly parishioner involved a matter of public interest]; *Carney v. Santa Cruz Women Against Rape* (1990) 221 Cal.App.3d 1009, 1021 [organization newsletter that described men who had been allegedly " 'hassling/assaulting/raping' women" was a publication on matters relating to "sexual harassment and violence against women," a topic "of pressing public concern"].)[11]

In the trial court, Foley argued the publication at issue was the updated list of priests "identified as having 'credible allegations' against them," but he failed to establish the falsity of this purported act of defamation. He argued that placing his name on this list was a false factual assertion because the "statement that [he] has '***credible***' allegations against him essentially states, as a fact, the opposite of the non constat finding[.]" (Emphasis in original.) In his complaint, he alleged the tribunal found him "not guilty," and he asserted in his declaration that " 'non constat' " means " 'it is not established' or 'it is not agreed,' " and was "equivalent to a verdict of 'not guilty' in the American justice system."[12]

---

[11] In the trial court and on appeal, Defendants have consistently asserted the plaintiff bears the burden of proving the falsity of statements relating to matters of public concern. Foley has not disputed this is the governing rule. In his opening brief on appeal, he identifies falsity as one of the elements of defamation "at issue" and attempts to demonstrate Defendants made statements that were "directly false and impliedly false," from which we infer that he concedes the burden to prove falsity is with him. For the reasons just stated, we agree with this implied concession.

[12] In his brief opposing the anti-SLAPP motion, Foley asserted that according to Black's Law Dictionary, " '[n]on constat' means 'it does not appear' or 'it is not clear or evident.' " He failed to establish, however, that Black's Law Dictionary is considered an authority with bearing on matters of canon law.

This theory of falsity was flawed from the outset.  A basic tenet of American criminal justice is that a not guilty verdict is not a determination of factual innocence.  An acquittal "simply indicates that the prosecution did not prove the defendant's guilt beyond a reasonable doubt, [and] does not directly address whether he committed the charged offense."  (*People v. Scott M.* (1985) 167 Cal.App.3d 688, 698–699 (*Scott M.*), overruled in part on other grounds by *People v. Adair* (2003) 29 Cal.4th 895, 907; see also *Scott M.,* at p. 700 [" '[T]he requirement of proof beyond a reasonable doubt often results that defendants, who are not factually innocent, are acquitted.' "]; accord *People v. Matthews* (1992) 7 Cal.App.4th 1052, 1056.)

Even if we ignore the analogy to "a verdict of 'not guilty' in the American justice system" and focus on Foley's assertion that " 'non constat' " means " 'it is not established' " or " 'it is not agreed' " (or " 'it does not appear' " or " 'it is not clear or evident' " as argued in his opposition brief (see footnote 12, *ante*), these interpretations still signaled the evidence was found insufficient to prove Foley committed the acts of which he was accused, a result that still would not establish that the allegation of misconduct was untrue or not worthy of belief.  (See *People v. Esmaili* (2013) 213 Cal.App.4th 1449, 1460–1461 [at preliminary hearing, the "magistrate made it clear that while he was concerned about inconsistencies in [alleged victim's] testimony and the prosecution's ability to obtain a conviction as a consequence," he nevertheless "believed '[t]here's something there' " and denied the petition for factual innocence; Court of Appeal affirmed, ruling that in the absence of a finding the victim's testimony was untruthful, "we cannot say that *no* person of ordinary care and prudence would believe or strongly suspect appellant was guilty of the charged offense"].)

Not only was Foley's theory of falsity flawed; he also failed to substantiate it with competent, admissible evidence. (*Sweetwater Union*, *supra*, 6 Cal.5th at p. 940.) The only evidence he offered to show the falsity of characterizing him as credibly accused of sexual abuse was his own declaration. In paragraph 5, he asserted the Sacramento parents' testimony before the tribunal was conflicting and was rejected as not credible, and that the tribunal's verdict of " 'non constat,' " meant " 'it is not established' or 'it is not agreed,' " and was "equivalent to a verdict of 'not guilty' in the American justice system." In paragraph 6, he stated the Sacramento Police Department investigated the allegations but "took no action," that the " 'not guilty' verdict [was] validated by Rome," and that "no civil, criminal, or canonical action" was otherwise taken against him. However, both of these paragraphs were ruled inadmissible in response to Defendants' evidentiary objections.

On appeal, Foley challenges the trial court's rulings, but he fails to establish an abuse of discretion. (See *Park*, *supra*, 201 Cal.App.4th at p. 1427 [trial court's evidentiary ruling is reviewed for an abuse of discretion].) Foley first argues the trial court's minute order sustaining five of Defendants' 14 objections to his declaration was an improper "blanket ruling[ ]." We disagree. The so-called "blanket" rulings that appellate courts have viewed with suspicion are those excluding vast swaths of evidence on grounds so perfunctory they suggest reflexive, unconsidered judicial action. (See, e.g., *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 249–250, 254–256 (*Nazir*) [trial court ruling that perfunctorily sustained 763 out of 764 evidentiary objections, many of them frivolous, was an abuse of discretion because it could not possibly have been guided by fixed legal principles]; *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 522 (*Greenspan*) [trial

court ruling sustaining all but one of defendants' objections to 30 of plaintiff's 39 exhibits was "cryptic"].)  The trial court's ruling in this case was not of that ilk.  The court sustained fewer than half of Defendants' objections to Foley's declaration, which resulted in the exclusion of four of its 13 paragraphs.  This is not the sort of sweeping, presumptively unconsidered ruling criticized in *Nazir* and *Greenspan*.  Moreover, although the trial court did not explain its reasoning, under *Greenspan*, we do not simply reverse cryptic evidentiary rulings, but rather we consider for ourselves whether each underlying objection has merit.  (See *Greenspan*, at p. 522 ["Lacking any guidance from the trial court, we must consider *every* objection . . . to decide if *any* has merit."].)

Foley next tries to demonstrate that Defendants' individual evidentiary objections were lacking in merit, but his arguments are perfunctory and ultimately unpersuasive.  He repeatedly complains that it is unclear which of Defendants' objections "apply to which sentences."  We disagree.  Although Defendants did assert several objections to each of the paragraphs in Foley's declaration, they indicated the specific text challenged by each objection in their supporting argument.  By sustaining the objections, the court necessarily indicated its agreement with Defendants' positions and ruled the challenged text inadmissible.  Contrary to Foley's contention otherwise, it was not unclear which statements in his declaration were the subject of Defendants' various objections, or which parts of his declaration were rendered inadmissible by the court's ruling.

Turning to the specific objections themselves, Defendants objected that paragraph 5 contained inadmissible hearsay to the extent it purported to describe the testimony offered, cross-examination conducted, and testimony rejected by the tribunal, and the ruling of the tribunal.  On appeal, Foley

31

maintains: "The statements in paragraph 5 are not hearsay because they are not offered for the truth of the matter stated." This is Foley's entire argument, and it is a puzzling one. If the statements were not offered for their truth, then for what relevant purpose were they offered? And if the statements were not offered for their truth, how could they assist Foley in meeting his second-step burden of establishing facts to support his claims? Foley does not answer these questions. Moreover, contrary to his claim the challenged assertions were not offered for their truth, his declaration presents them as facts. We are not persuaded this objection should have been overruled.

The trial court also sustained Defendants' objection that paragraph 5 contained improper lay opinion testimony. Defendants argued Foley was not competent to render an expert opinion about the result of the canonical trial or the meaning of " 'non constat.' " On appeal, Foley simply asserts that "[p]aragraph 5 does not include any expert opinion" and that "a lay person may testify as to any matter rationally based on the perception of the witness and helpful to a clear understanding of his testimony." We find this argument unpersuasive. Although lay witnesses may testify about matters rationally based on their perception, they may not express opinions on matters that are outside common knowledge or experience. (Evid. Code, § 801, subd. (a).) Issues of canon law and "[t]he by-laws and internal rules and regulations of religious organizations" are subjects outside common knowledge and are appropriately offered "in the form of expert testimony." (*Stevens v. Roman Catholic Bishop of Fresno* (1975) 49 Cal.App.3d 877, 883.) Foley did not establish that he possessed any background or expertise in canon law nor did he otherwise identify the source of his purported

32

knowledge about the tribunal's verdict or the meaning of " 'non constat.' " We see no error in the court's ruling sustaining this objection.

The trial court also sustained Defendants' objection that Foley failed to lay a foundation in personal knowledge for his assertions about other lawsuits filed by the Sacramento parents and their son's failure to participate in the tribunal. On appeal, Foley argues that under *Fashion 21 v. Coalition for Humane Immigrant Rights of Los Angeles* (2004) 117 Cal.App.4th 1138, 1148 (*Fashion 21*), evidence that lacks a proper foundation may be used to defeat an anti-SLAPP motion so long as the plaintiff shows a high probability of establishing a proper foundation. Foley overstates the holding of *Fashion 21*. In *Fashion 21*, the Court of Appeal held it was not error for the trial court to consider video evidence offered in opposition to an anti-SLAPP motion, even though the videotape was not properly authenticated. (*Id.* at p. 1148.) *Fashion 21* dealt only with the "simple matter" of a failure of authentication and did not purport to overrule the fundamental requirement that evidence submitted in opposition to an anti-SLAPP motion must be presented in a form that would be admissible at trial. (*Ibid.*) In *Sweetwater Union, supra*, 6 Cal.5th at page 945, which was decided after *Fashion 21*, our high court confirmed that declarations offered in opposition to an anti-SLAPP motion "must reflect that they were made by competent witnesses *with personal knowledge of the facts they swear to be true*." (Italics added.) As Foley fails to show he comported with this requirement, we see no basis for overturning the trial court's evidentiary ruling.

Once these three objections (hearsay, improper lay opinion, lack of foundation) were sustained, all of the statements in paragraph 5 that might have supported Foley's theory of falsity were rendered inadmissible, including his statements about the parents' lack of credibility and the

meaning and effect of the " 'non constat' " verdict. We need not consider Defendants' remaining objections to paragraph 5, since they merely serve to provide additional grounds for excluding the same testimony.

Turning to paragraph 6, Defendants objected that it lacked foundation, contained hearsay, improper expert opinion testimony, and irrelevant matter. More specifically, Defendants' lack of foundation objection was based on the argument that Foley failed to establish a basis in personal knowledge for his averments about the investigation conducted by the Sacramento Police Department, the purported " 'not guilty' " verdict reached by the tribunal, or the actions taken " 'by Rome' " or by any other civil, criminal, or canonical tribunals. In his opening brief on appeal, Foley perfunctorily asserts he "has personal knowledge of the criminal investigation and that no criminal charges were filed against him" and "[h]e also has personal knowledge that no action was taken against him by the authorities in Rome." We cannot accept these assertions as true, however, because they are arguments of counsel, and have no evidentiary value. (*In re Zeth S.* (2003) 31 Cal.4th 396, 413, fn. 11 ["It is axiomatic that the unsworn statements of counsel are not evidence."].) Foley was required to set forth the basis for his personal knowledge *in his declaration.* (*Sweetwater Union, supra,* 6 Cal.5th at pp. 944–945, 947–948; see Evid. Code, § 702, subd. (a) ["[T]he testimony of a witness concerning a particular matter is inadmissible *unless* he has personal knowledge of the matter. Against the objection of a party, *such personal knowledge must be shown* before the witness may testify concerning the matter." (Italics added.)].) He does not show he complied with this requirement.

Foley also repeats his earlier argument that under *Fashion 21*, he did not have to establish a foundation in personal knowledge but instead only

34

had to show a "high probability" of meeting the foundation requirement. As we have discussed, however, Foley overstates the holding of *Fashion 21*, and our high court has since confirmed that declarations offered in opposition to an anti-SLAPP motion "must reflect that they were made by competent witnesses *with personal knowledge of the facts they swear to be true*." (*Sweetwater Union*, *supra*, 6 Cal.5th at p. 945, italics added.) Foley thus fails to establish that this objection lacked merit. As its effect was to render paragraph 6 inadmissible in its entirety, it is unnecessary to consider Defendants' remaining objections to the same paragraph.

Foley's failure to show error in the evidentiary rulings that resulted in paragraphs 5 and 6 being deemed inadmissible is fatal to his ability to demonstrate a probability of prevailing on the theory that he was defamed by the addition of his name to the list of credibly-accused priests. These paragraphs contained his only evidence of the purported falsity of characterizing him as credibly accused of molestation. Once they were removed from contention, he was without any proof to substantiate an essential element of his claim.

As we mentioned above, on appeal, Foley has expanded his theory of libel significantly to include a number of statements he did not present as defamatory in the trial court. His new theories are numerous and too detailed to describe in all their particulars, but we provide the following overview. Foley now contends that adding his name to the updated list of credibly-accused priests was not just "directly" false but also *impliedly* false because by placing his name with the names of other priests, the list "lumped [him] together" with individuals who were "actual abusers." He argues that certain statements of the authoring journalists and "the third parties they interviewed" support the view that the list could be reasonably interpreted by

a jury as implying he "was a child molester."[13] He focuses on certain quotes attributed to McElroy and argues that although McElroy did not mention him by name, McElroy's use of certain words (like " '*this*,' " " 'victims' " and " 'perpetrator'") defamed Foley by implication, by "lumping Father Foley in with the group of clergy who have actually molested minors." He criticizes a number of statements attributed to Eckery, including that the Sacramento couple's allegation of abuse involved two children, rather than one, and that the diocese made " 'sure the family got justice,' " which Foley claims falsely implied he was criminally punished for the alleged molestation. He complains that he was defamed by Eckery's "tone and word choice" in the statement, " '[w]hen he couldn't be judged guilty at trial, it just complicated things with how to deal with him.' " He contends the quote attributed to Valdivia, " 'He wasn't guilty, but that's not to say he was innocent,' " insinuated that Foley "did, in fact, sexually abuse minors, just like the other priests originally listed." He also claims Eckery and Valdivia defamed him by stating his priestly faculties had been suspended, something Foley denies.

For a number of reasons, we reject Foley's reliance on these newfound theories to demonstrate a probability of prevailing on his claim. First, he failed to preserve his contentions for appeal because he did not present them in the trial court. " ' " [I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could

---

[13] In addition to being forfeited and unpleaded (as we discuss below), Foley's newfound complaints about the tone of the articles and the context in which Defendants' statements were presented are meritless. Foley relies on cases that do not apply because, unlike Foley's complaint, they involved suits against the publisher or reporter responsible for the reports as a whole (such as *Van Buskirk v. Cable News Network, Inc.* (9th Cir. 2002) 284 F.3d 977, 984–985, and *Crane v. Arizona Republic* (9th Cir. 1992) 972 F.2d 1511, 1522). These cases do not support holding Defendants liable for aspects of the articles attributable to the authoring journalists.

have been but were not presented to the trial court.'" ' " (*Hunter v. CBS Broadcasting Inc.* (2013) 221 Cal.App.4th 1510, 1526 [declining to consider argument concerning public issue raised for the first time on appeal from anti-SLAPP ruling]; *Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997 [new theories of liability may not be asserted for the first time on appeal].)  Foley's failure to offer any of these theories of libel for the trial court's consideration in the first instance forfeits his ability to rely on them to demonstrate reversible error on appeal.

Second, as discussed above, none of the statements on which Foley now relies are alleged in the complaint, as required to plead libel.  Because "the issues in an anti-SLAPP motion are framed by the pleadings" (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 672), and "an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint" (*Kahn, supra,* 232 Cal.App.3d at p. 1612, fn. 5), Foley is not free to simply craft new theories of libel on appeal based on statements that do not appear in the allegations of his complaint.  Rather, as we explained in *Medical Marijuana*, *supra*, 46 Cal.App.5th at page 895, Foley cannot demonstrate a probability of prevailing based on the statements and theories he failed to allege.

Third, although it is his burden to demonstrate a factually substantiated libel claim, Foley's arguments are almost entirely devoid of accompanying citations to the record showing his newly-identified theories do, in fact, have evidentiary support.  "In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.  Rather than scour the record unguided, we may decide that the appellant has forfeited a point urged on appeal when it is not supported by accurate citations to the record."  (*WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881,

894–895 (*WFG*), citing *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239 & fn. 16, and Cal. Rules of Court, rule 8.204(a)(1)(C).) To the extent Foley's appellate briefs offer new theories of liability without providing citations to the record showing they are substantiated by admissible evidence, we are not required to determine for ourselves whether and how Foley might seek to prove them. Instead, we deem them forfeited.

The only new libel theory supported by citations to record evidence is Foley's theory that Eckery and Valdivia falsely stated he was stripped of his priestly faculties. However, the evidence he cites—paragraph 9 of his own declaration and paragraph 5 of McElroy's declaration—is insufficient to substantiate this theory. Paragraph 9 of Foley's declaration was ruled inadmissible in response to Defendants' evidentiary objections; Foley fails to show these rulings were erroneous.[14] Paragraph 5 of McElroy's declaration merely states that he stopped issuing letters of good standing to Foley in

---

[14] In the relevant portion of paragraph 9, Foley asserted McElroy "continued [a] vendetta" against Foley by "falsely claiming in September 2018 that he had suspended my priestly faculties in 2015[.]" Defendants objected to this testimony on a number of grounds, including that it was hearsay and lacked foundation, and the trial court sustained these objections. On appeal, Foley argues perfunctorily that his averments were not offered for their truth, and that under *Fashion 21*, *supra*, 117 Cal.App.4th at page 1148, evidence that lacks a proper foundation may be used to defeat an anti-SLAPP motion if there is a high probability a proper foundation could be established. These arguments repeat positions we have already considered and rejected.

2015, and does not, on its own, establish the falsity of Eckery and Valdivia's assertions.[15]

For all of these reasons, we conclude that Foley failed to demonstrate a probability of prevailing on his cause of action for "Defamation (Libel)." Having reached this conclusion, we need not and do not consider whether Defendants' allegedly defamatory statements were subject to the common interest privilege set forth in Civil Code section 47, subdivision (c), or whether Foley's claims are barred by the ministerial exception.[16]

IV.

*Foley's Cause of Action for Intentional Infliction of Emotional Distress Is Derivative of His Libel Cause of Action and Likewise Fails*

Foley's second cause of action for intentional infliction of emotional distress is based on Defendants' alleged "publishing [of] false and defamatory allegations in the newspapers[.]" Foley concedes this cause of action arises from Defendants' protected speech activities and "must stand or fall along

_____

[15] At the end of his discussion of his theories that Valdivia defamed him, Foley cites two pages of his declaration for the proposition that "false accusations are actionable" and his evidence shows "the assertions and implications of the articles as false" and "the canonical and civil authorities found no credible evidence to support actionable charges against him." Citing entire pages of his declaration is unhelpful, though, because each page contains several paragraphs, some of which were ruled inadmissible. Foley's other evidentiary citations included the paragraph numbers, but he omitted paragraph numbers with these citations. The failure to provide an accurate citation directing us to the specific testimony he wishes us to consider forfeits the point. (*WFG*, *supra*, 51 Cal.App.5th at pp. 894–895.) Moreover, so far as we can determine, Foley is referring to paragraphs 5 and 6 of his declaration, which, as we have discussed, were properly ruled inadmissible.

[16] We also need not and do not address other points disputed by the parties, including whether the statements attributed to Defendants in the news articles were opinions or provably false assertions.

with the defamation claim." Our determination that Foley did not meet his burden of establishing a minimally meritorious cause of action for "Defamation (Libel)" thus applies equally to this derivative claim. (See, e.g., *Sonoma Media Investments, LLC v. Superior Court* (2019) 34 Cal.App.5th 24, 43 [concluding that plaintiffs' failure to make a prima facie showing of falsity was equally fatal to plaintiffs' derivative claims of libel per se and false light invasion of privacy as to their defamation claim].)

## DISPOSITION

The trial court's order granting the anti-SLAPP motion is affirmed. Defendants are entitled to their costs on appeal.

DO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.